**UNITED STATES of America, Appellee,**

v.

**Anthony L. CAVALLARO and Gerald J. Brown, Appellants.**

**Nos. 885, 1086, Dockets 76–1437, 76–1481.**

United States Court of Appeals, Second Circuit.

Argued March 16, 1977.

Decided April 19, 1977.

Joseph A. Pavone, Asst. U. S. Atty., Syracuse, N. Y. (Paul V. French, U. S. Atty., N. D. N. Y., Albany, N. Y., on the brief), for appellee.

Arnold Wallach, New York City (Joel A. Scelsi, Endicott, N. Y., on the brief), for appellant Cavallaro.

Stuart E. Finer, Utica, N. Y., for appellant Brown.

Before LUMBARD and TIMBERS, Circuit Judges, and DAVIS, Judge, Court of Claims.*

LUMBARD, Circuit Judge:

Anthony L. Cavallaro and Gerald J. Brown appeal from convictions entered in the Northern District on September 16, 1976, after a three-day jury trial before Judge MacMahon. Appellants were tried and found guilty on one count of kidnapping in violation of 18 U.S.C. §§ 1201(a) and 2. Cavallaro and Brown were each sentenced to 25 years imprisonment. Appellants claim (1) that proof of an interstate kidnapping was not established beyond a reasonable doubt; (2) that 18 U.S.C. § 1201(a) is unconstitutionally vague; (3) that appellants' right of confrontation was violated when the court ruled it would not allow the government's chief witness to be questioned regarding her current address; (4) that the court erred in admitting evidence of a subsequent crime; and (5) that the court exhibited a bias against appellants during the trial, which deprived them of a fair trial.

The government's chief witness was Mary Shepardson. She testified that she lived with her infant child in a trailer in Endicott. Shepardson had only recently moved into a trailer home from an apartment she shared with Richard Sampson. She testified that before living with Sampson for approximately one month, she had been living with another individual, Dave Baer. On December 10, 1975, Shepardson went to the apartment of Debbie Buchanan in order to have Buchanan babysit her child. Buchanan was living with Richard Finch in a small apartment house at 5 Camden Street in the Endwell area. Sampson occupied an apartment above Buchanan and Finch.

After Shepardson dropped off her child with Buchanan, she hitchhiked to the welfare office to obtain money to buy fuel for her trailer. She was picked up by Cavallaro, whom Shepardson had known for about one year. Cavallaro drove her to the welfare office and she later returned to Buchanan's apartment for a time and then went out on further errands. Upon her return, Shepardson was met at the door by

Buchanan who expressed concern for her safety. Buchanan told Shepardson that she should stay inside. Shortly thereafter, Brown, whom Shepardson had not met before, came to Buchanan's apartment. He told Shepardson that Dave Baer was outside and wanted to speak to her. Shepardson and Brown went outside to a car where Brown told Shepardson, "Get in the car. We are going for a ride." Dave Baer was sitting in the back seat, his face was swollen and "he looked scared"; Cavallaro was sitting in the driver's seat. At the time Shepardson did not know what was going on but she felt that when Brown told her to come outside she "had no choice."

Shepardson testified that after she entered the car, Cavallaro drove off down the highway. She sat in the front passenger seat while Brown sat behind her in the back seat and held her hands behind the seat "most of the time." Brown told her that she had better tell the truth about the "rip-off" and that he had been hired to kill her. Cavallaro told her that he was tired of being ripped off and lied to. Apparently, Cavallaro had been "ripped off" in a marijuana transaction and believed that two individuals, Jerry Brooks and David Lamont, were responsible. Cavallaro also believed that Shepardson might be involved, or at least that she could provide some information about Brooks. Despite continued threats, however, Shepardson insisted that she knew nothing. Cavallaro then stopped the car, and turned and pointed a gun at her. Shepardson exclaimed, "Oh my God. I don't know anything." At this point Brown told Cavallaro to "cool it" and that he would take care of the job he had been hired to do.

At some point during the ride Shepardson looked out the window and saw a sign that read "Welcome to Pennsylvania." Brown continued to threaten her, telling her that she had only a little time to talk and if she wanted to see her son again, she should tell him where they could find the people involved in the rip-off. Cavallaro stopped the car a second time and Shepardson and Baer were ordered to stand outside, in front of

the car. Then, both Brown and Cavallaro drew weapons. Brown fired three shots— one going past Shepardson's elbow and two landing at her feet. After this, Brown told Cavallaro that she must be "o.k." and did not know anything.

After all four got back in the car, Brown told Shepardson that he had just saved her life. They then stopped at a bar in Montrose, Pennsylvania for approximately one-half hour. Cavallaro then drove them back to Baer's apartment for a short visit and then dropped off Shepardson at Buchanan's apartment some time early in the morning on December 11.

Shepardson testified that she was met at the door by Finch and that, after drinking some beer, she fainted. She was awakened early that morning by the police, who questioned her regarding the events of the previous night.

Baer, called to testify by the government, told a somewhat different story. He stated that appellants came to him some time on December 9 or 10 seeking the whereabouts of Brooks and Lamont. Later that same day, at about 9:00 p. m., they called him on the telephone and told him that Shepardson was obtaining some information about Brooks and that she was expecting a visit from them; further, they asked him to come along because Shepardson was his girlfriend. Baer agreed to go along and called Shepardson and told her they were coming over. According to Baer, during the car ride Brown questioned Shepardson, "trying to sound angry," but did not use force or hold her hands behind the seat. Baer also stated that it was his idea to have appellants place Shepardson and him in front of the car and to fire some shots—the plan being to make Shepardson believe they were going to harm him if she did not reveal what she knew. Baer stated that the guns were aimed up in the air when the shots were fired.

Buchanan and Finch were also called by the government. Buchanan testified that when Brown came to her apartment on the evening of December 10, he entered the apartment with a gun tucked under his belt

and told Shepardson to get her coat and that someone was waiting to speak with her in the car. Brown then took Shepardson's arm and Buchanan watched them depart. Buchanan stated that she saw Shepardson being pushed into a dark colored car.

Finch testified that at about 2:00 p. m. on December 10 Cavallaro, Brown, and Baer came to his apartment. They told him they wanted to see Richard Sampson in order to find "Jerry," who they believed had "ripped them off." According to Finch, Shepardson was present when a general discussion took place regarding Brooks and Sampson. Sampson was not at home and Finch took appellants upstairs and used a knife to open Sampson's door. After inspecting the apartment, appellants left.

Finch stated that he was home at about 2:30 a. m. on December 11, at which time Cavallaro arrived with Shepardson. Cavallaro, who was carrying a pistol in his left hand, dropped off Shepardson and left immediately; Shepardson was "shaking" when she returned.

Richard Sampson, called by the government, testified that Brown arrived at his apartment around 2:00 a. m. on December 11. He drew a gun and told Sampson that they were going to wait there until Cavallaro arrived. When Cavallaro arrived he told Sampson that they "would have a talk." Sampson had spoken with Cavallaro earlier in the day and knew he and Brown were there about the "dope rip-off." The three men then went to Cavallaro's house where Sampson was struck by Cavallaro and shot by Brown. The court instructed the jury that this evidence could be considered on the issues of intent, common plan or design, and the identity of Brown.

Appellants did not take the stand and called only one witness, Ronald Steele, the bartender on duty at the Pennsylvania bar at which appellants, Shepardson and Baer

stopped on the night of December 10. He testified that he did not notice anything unusual about their behavior.

■ Appellants first contend that the evidence was insufficient to prove that they unlawfully seized, confined, inveigled, or abducted Shepardson and transported her interstate. See 18 U.S.C. § 1201(a)(1). Appellants' theory was that Shepardson knowingly and voluntarily accompanied them into Pennsylvania and the assault and confinement at gunpoint were simply state crimes with no interstate character. The simple answer is that this argument was rejected by the jury, and the verdict was amply supported by the record. See, e. g., *United States v. Falcone*, 544 F.2d 607, 611 (2d Cir. 1976), cert. denied, —— U.S. ——, 97 S.Ct. 1329, 51 L.Ed.2d 595 (1977); *United States v. Freeman*, 498 F.2d 569, 571 (2d Cir. 1974). Since appellants did not take the stand, the only witnesses to the ride were Shepardson and Baer. Shepardson testified that she "had no choice" when she accompanied Brown to the car. This was corroborated by Buchanan's testimony that Brown arrived at the apartment with a gun tucked into his belt, told Shepardson to get her coat and took her by the arm. Further, Buchanan stated that she saw Shepardson being pushed into the car. Shepardson's testimony indicates that her life was continuously threatened and that during most of the ride her arms were held from behind by Brown. The evidence amply supported the verdict.

■ 18 U.S.C. § 1201 makes interstate kidnapping a crime if the victim is held "for ransom or reward or otherwise".[1] Appellants claim that section 1201 was intended by Congress to make criminal only kidnappings conducted for pecuniary gain and that if the word "otherwise" is read to reach abductions not motivated by ransom or reward, it renders the section unconstitu-

---

1. Section 1201 provides in relevant part:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(1) the person is willfully transported in interstate or foreign commerce;

\* \* \* \* \* \*

shall be punished by imprisonment for any term of years or for life.

tionally vague. However, the argument that section 1201 requires a motive of pecuniary profit has been rejected by the Supreme Court, see *United States v. Healy,* 376 U.S. 75, 81–82, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964), and more recently by this court. *United States v. De LaMotte,* 434 F.2d 289, 292–93 (2d Cir. 1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). See *United States v. Atchison,* 524 F.2d 367, 369–70 (7th Cir. 1975). The word "otherwise" was added to section 1201 in 1934 and means exactly what any person of ordinary intelligence would understand: that the statute extends to cases of persons kidnapped and held " 'not only for reward, but for any other reason.' " *United States v. Healy,* supra, 376 U.S. at 81, 84 S.Ct. at 557, quoting S.Rep.No.534, 73d Cong., 2d Sess., Mar. 20, 1934; H.R.Rep.No.1457, 73d Cong., 2d Sess., May 3, 1934, p. 2. See *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1971).

Appellants next contend that their right to confront and cross-examine the witnesses against them was violated when the trial court indicated that it would not allow Shepardson to be questioned regarding her current address. Prior to the commencement of the government's case, the prosecutor advised the court that shortly after the kidnapping Shepardson had been relocated pursuant to the witness protection program and asked the court to direct the defense not to inquire into her present address. In response to the court's inquiry whether any threats had been made on the witness' life, the prosecutor indicated that "there were some problems immediately after this incident took place" and that there was "tremendous fear on the part of the witness." The court then asked the defense whether the witness' address was material to its case. Counsel responded that the witness' having been "secreted may have been a disadvantage" to defense investigative efforts and might be relevant to the witness' credibility. The court then ruled that defense questions concerning Shepardson's current address should not be asked "unless you find it absolutely necessary" and indicated that at that point the court would

hold an *in camera* hearing on the subject; the court then expressed some doubt about this procedure and stated that the defense had failed to indicate why such questions were material. At this point, defense counsel interjected as follows: "Well, I am really not concerned where she is presently. I could (sic) care less. But I think the fact is important. Once this incident occurred, the Government, whether rightly or wrongly, just whisked this woman away." At trial, defense counsel elicited from Shepardson the fact that counsel had not previously spoken with her and questioned her regarding her relationship with the government. The court sustained an objection to a question concerning her whereabouts after the kidnapping; defense counsel neither made an offer of proof nor attempted to pursue the line of questioning.

The address of a government witness is generally a proper subject of defense inquiry and may be necessary for in-and-out-of-court investigation of a witness. See *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Alford v. United States,* 282 U.S. 687, 693, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Marti,* 421 F.2d 1263, 1265 (2d Cir. 1970). However, where the government voices a legitimate concern for a witness' safety, the trial court must balance the potential danger to the witness against the need of the defense for the information. See, e. g., *United States v. Persico,* 425 F.2d 1375, 1383–84 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); *United States v. Baker,* 419 F.2d 83, 87 (2d Cir.), cert. denied, 397 U.S. 971, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1969); *United States v. Bennett,* 409 F.2d 888, 901 (2d Cir.), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969). The court did not abuse its discretion in denying information of Shepardson's address to the defense. There was good reason to fear for the safety of the witness. The prosecutor represented his belief that there had been difficulties following the kidnapping and that the witness was in great fear. Further, where the witness is the victim of a kidnapping and the defendants are at large

on bail, as was true here, the possibility of foul play is obvious. See, e. g., *McGrath v. Vinzant,* 528 F.2d 681, 683–85 (1st Cir.), cert. dismissed, 426 U.S. 902, 96 S.Ct. 2221, 48 L.Ed.2d 827 (1976). In contrast, the defense not only failed to show any "particularized need" to question Shepardson regarding her current address, see *United States v. Persico,* supra, 425 F.2d at 1383, but defense counsel appears to have admitted to the court that the defense's only concern was to bring out that the defense had not interviewed Shepardson and that she might be receiving something in return for her testimony. The court did not prevent such questioning and cross-examination along these lines was in fact conducted. See *United States v. Bennett,* supra, 409 F.2d at 901. Moreover, cross-examination of Shepardson demonstrated considerable familiarity with her background and acquaintances, undoubtedly because Cavallaro had personally been acquainted with her for approximately one year prior to the kidnapping. See *United States v. Persico,* supra, 425 F.2d at 1384; *United States v. Baker,* supra, 419 F.2d at 87.

 Appellants next contend that the court erred in allowing Sampson to testify that appellants held him at gunpoint, took him to Cavallaro's house, and shot him. It is well-established in this circuit that evidence of subsequent similar acts, including other crimes, is admissible in the discretion of the trial court if "it is substantially relevant for a purpose other than merely to show defendant's criminal character or disposition", *United States v. Deaton,* 381 F.2d 114, 117 (2d Cir. 1967), and its probative worth outweighs its potential prejudicial impact. See *United States v. Grady,* 544 F.2d 598, 605 (2d Cir. 1976); *United States v. Miranda,* 526 F.2d 1319, 1331 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). It was highly relevant that Sampson, who was also believed by appellants to be a likely source of information, was forcefully abducted almost simultaneously with the return of Shepardson; particularly, in light of appellants' trial theory that Shepardson voluntarily accompanied them and that no force

was used until Cavallaro lost his temper in Pennsylvania. Thus, the evidence was highly probative of appellants' intent to abduct Shepardson and suggested a common plan or design. See, e. g. *United States v. Grady,* supra, 544 F.2d at 605; *United States v. Campanile,* 516 F.2d 288, 292 (2d Cir. 1975). See Fed.R.Ev. 404(b).

Finally, the claim that questions and comments voiced by the trial judge manifested a bias against the appellants and deprived them of a fair trial is not supported by the record.

The convictions are affirmed.