**UNITED STATES of America, Appellee,**

v.

**Ekram MANAFZADEH,
Defendant-Appellant.**

**No. 263, Docket 78–1220.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 10, 1978.
Decided Jan. 23, 1979.

Leonard J. Levenson, New York City, for defendant-appellant.

Howard W. Goldstein, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

Ekram Manafzadeh appeals from his conviction after a jury trial in the United States District Court for the Southern District of New York, Richard Owen, *Judge,* on two counts of unlawfully transporting or causing to be transported in interstate commerce falsely made checks in violation of 18 U.S.C. §§ 2314 and 2.[1] Manafzadeh was sentenced to concurrent five-year terms of imprisonment on each count and is presently serving his sentence.[2] On appeal, Manafzadeh raises five issues, the primary one being the Government's use in its case-in-

---

1. 18 U.S.C. § 2314 provides in relevant part: "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited . . . Shall be fined not more than $10,000 or imprisoned not more than ten years, or both." 18 U.S.C. § 2 provides: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

2. Manafzadeh was also indicted for conspiracy to transport forged securities in interstate commerce in violation of 18 U.S.C. § 371. The jury was unable to reach a verdict on this count, and the charge was dismissed with the consent of the U. S. Attorney at sentencing.

chief of evidence of subsequent crimes by the defendant. Since we conclude that the admission of the other-crimes evidence was improper in this case, we reverse the conviction and remand for a new trial.

In September, 1976, Hossein Mohammad Kia,[3] an Iranian citizen, entered the United States and checked into the Hilton Hotel, Washington, D.C. While Kia was still in Washington, Manafzadeh, also Iranian, traveled from New York City to Washington and also stayed at the Hilton Hotel from September 21 to September 24, 1976. On September 28, 1976, Kia, accompanied by an interpreter,[4] went to the Chase Manhattan Bank (hereinafter called "the Chase bank") at 410 Park Avenue in New York City and opened an international checking account in the name of Mehdi H. Barkhordar. In support of his application to open the account Kia produced a false passport and gave a temporary local address, false bank references and false employment information. He also made an initial deposit of $2,000.

On October 12, 1976, Kia and his interpreter deposited six counter checks in the Barkhordar account, three drawn on a nonexistent account at the First National Bank of Miami and three bearing unauthorized signatures for an account at the First National Bank of Chicago.[5] Each of the six checks was made payable to "Mehdi H. Barkhordar" in the amount of $950,000, resulting in fraudulent deposits totalling $5,700,-000. The dollar amounts on the six fraudulent checks were imprinted by a Hall-Welter Speedrite checkwriter of the 900 or 914 series. At the time when the checks were drawn Aminco Trading Company (hereinafter called "Aminco"), which is wholly owned by Manafzadeh, had a Hall-Welter Speedrite 914 checkwriter at its office,[6] which had been purchased in May, 1976. Manafzadeh's fingerprint was found on both the checkwriter and one of the fraudulent Miami checks. After deposit, the checks were transmitted through interstate commerce to the respective drawee banks, where payment was refused.

On October 18, 1976, Kia and his interpreter went back to the Chase bank in New York and had that bank certify five checks drawn on the Barkhordar account for a total of $2,717,500.[7] On that same day four of the certified checks were deposited in Aminco accounts in three different banks in New York City. The fifth certified check in the sum of $650,000 was wired by Kia through Western Union to Las Vegas, where Kia, upon receiving money orders from Western Union for the full amount less telegraphic charges,[8] kept $44,219.35 for personal use. The remaining $600,000 was returned to New York City in the form of 10 Western Union drafts and deposited in an Aminco bank account on October 21, 1976. The Government's contention at trial was that Manafzadeh was the behind-the-scene "brain" of this scheme and its implementation by Kia and his interpreter.

---

3. Kia was indicted along with Manafzadeh on all three counts. Kia pleaded guilty to the conspiracy count and to the substantive count concerning the checks drawn on the First National Bank of Miami.

4. The interpreter was alleged in the indictment to be Abdul Vahab Belat. Belat has not yet been apprehended.

5. The three checks from the First National Bank of Chicago formed the basis for Count Two of the indictment; the three checks from the First National Bank of Miami formed the basis for Count Three of the indictment.

6. An F.B.I. expert testified that there was no way to link the imprint on a given check to a particular checkwriting machine unless there was damage to one or more of the keys, which was not the case here. The defense and the Government stipulated that approximately 130,000 Hall-Welter Speedrite checkwriters of the 900 and 914 series had been manufactured as of the time of trial.

7. It was not explained why the Barkhordar account showed "good and available" funds to cover the five checks at the time of certification when the Chase bank had already learned that the three Chicago checks would not be honored by the First National Bank of Chicago. However, despite the worthlessness of the six checks deposited in the account, the certification by Chase of the five checks drawn on the account was valid.

8. Western Union was paid $5,780.65 for telegraph charges.

The defense consisted largely of testimony by Kia, who stated that he had participated in the check fraud with two Americans he knew only by first name and that Manafzadeh was not part of the conspiracy. Kia claimed that he first met Manafzadeh on October 18 when Kia went to the Aminco office under the name of Barkhordar to purchase Iranian bonds, having been referred there by the Iranian Embassy. The certified checks allegedly were given to Manafzadeh as payment for the Iranian bonds, $765,000 worth of bonds having been given to Kia on the spot and the remaining $1,295,000 worth to be delivered to Kia in Iran by Manafzadeh's agent.[9]

When the Case bank learned of its mistaken certification of the checks, it traced them to the Aminco bank accounts and had those assets frozen by the respective banks. A representative of the Chase bank then negotiated with Manafzadeh for the return to Chase of the funds realized from the deposit of the certified checks.[10] Eventually $1,902,500 was returned; the remaining $765,000 Manafzadeh kept, claiming it was proper payment for the $765,000 worth of bonds sold by him to Kia.

Thus Manafzadeh's defense was not that he had innocently or mistakenly participated in the preparation or deposit of any of the six falsely made checks charged in the indictment, which were deposited in the Barkhordar account with Chase. His defense was that he had never been involved in the creation or negotiation of these fraudulent checks at all. He admitted that at a later point he had innocently accepted the certified checks drawn on the fraudulent Barkhordar account but contended that he had received these checks in payment for Iranian bonds sold to Kia.

The subsequent other-crimes evidence was introduced by the Government as part of its case-in-chief and admitted over the objection of Manafzadeh's counsel. According to the testimony of one Matavossian, in February of 1977, approximately four months after the events forming the basis of the indictment, the defendant Manafzadeh tried to recruit him to deposit $10,000 in a bank, using a false name and passport, and then withdraw $50,000 in cash and $2,950,000 in travelers checks. The details of the scheme were never fully explained and the plan was never carried out, although Matavossian testified he was given a false passport. The witness also testified that Manafzadeh told him that the plan was not dangerous because "it has been done several times and nothing has happened." Matavossian also testified that in May of 1977, seven months after the crimes alleged in the indictment, the defendant tried to get Matavossian to purchase some jewelry, using certified checks bearing a counterfeit bank certification. The bill for the rubber stamps apparently used to create the certification was found on Manafzadeh when he was arrested for this subsequent other crime.[11]

Manafzadeh's counsel objected to the admission of proof of the defendant's subsequent crimes, arguing that this was irrelevant to the only issue in the case, which was whether he had participated in the creation or deposit of the forged checks placed in the Barkhordar account with Chase, the interstate transportation of which was the charge in the indictment. Defense counsel repeatedly offered to stipulate that if the jury found that Manafzadeh had participated in the creation or deposit of the forged checks, then he would concede that the acts had been done with the necessary criminal intent, which would remove any possible contest as to his intent.

9. The four certified checks deposited in Aminco bank accounts on October 18, totalling $2,067,500, were allegedly payment for $2,060,000 worth of Iranian bonds. Kia testified that another conspirator had given Manafzadeh the 10 Western Union drafts, representing $600,000, on October 21, as payment for other "valuable papers" to be transferred in Iran.

10. Manafzadeh's counsel suggested that the defendant's fingerprint was placed on one of the Miami checks when Manafzadeh handled it during one of these negotiation sessions.

11. Instead of making the jewelry purchase Matavossian took the four "certified" checks, all drawn on a closed account at a Chemical Bank branch, directly to the police.

The trial judge nevertheless admitted the subsequent-crimes evidence with an instruction that it was to be considered by the jury "only in deciding the question of the defendant's intent on the crime charged in the indictment," (i. e., the transportation of the six forged checks in interstate commerce), provided the Government proved by other evidence that Manafzadeh had "transported or caused the transportation of the forged Chicago and Miami checks in interstate commerce," (T. 236–37). In his summation the prosecutor dwelt at length on the subsequent-crimes evidence. From his resulting conviction Manafzadeh appeals.

## DISCUSSION

■ Defendant's principal contention is that the district court committed reversible error in admitting evidence of his subsequent other crimes. Such evidence, of course, is not admissible to show that a defendant had a bad character or propensity to commit the crime in issue, although it may be admissible for some other relevant purpose. Fed.R.Evid. 404(b).[12] See *United States v. O'Connor,* 580 F.2d 38, 40 (2d Cir. 1978); *United States v. Knuckles,* 581 F.2d 305, 314 (2d Cir. 1978); *United States v. Williams,* 577 F.2d 188, 191 (2d Cir. 1978); *United States v. Benedetto,* 571 F.2d 1246, 1248 (2d Cir. 1978); *United States v. Gubelman,* 571 F.2d 1252, 1254 (2d Cir. 1978); *United States v. Cavallaro,* 553 F.2d 300, 305 (2d Cir. 1977); *United States v. Grady,* 544 F.2d 598, 604–05 (2d Cir. 1976); *United States v. Magnano,* 543 F.2d 431, 435 (2d Cir. 1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977). While we have taken the "inclusionary" approach to this rule, *United States v. O'Connor, supra,*

580 F.2d at 40, *United States v. Benedetto, supra,* 571 F.2d at 1248, we have also recognized that such other-crime evidence may not be received unless it is relevant to an actual issue in the case and unless its probative value on that issue is not outweighed by its unfair prejudice to the defendant. See *United States v. O'Connor, supra,* 580 F.2d at 40–43; *United States v. Knuckles, supra,* 581 F.2d at 314; *United States v. Williams, supra,* 577 F.2d at 191; *United States v. Benedetto, supra,* 571 F.2d at 1248; *United States v. Gubelman, supra,* 571 F.2d at 1254; *United States v. Cavallaro, supra,* 553 F.2d at 305; *United States v. Grady, supra,* 544 F.2d at 604–05. See also Fed.R.Evid. 403.[13]

■ There is no presumption that such other-crimes evidence is relevant. *United States v. O'Connor, supra,* 580 F.2d at 40; *United States v. Benedetto, supra,* 571 F.2d at 1248. "[C]aution and judgment are called for, and a trial judge faced with an other crimes evidence problem should require the Government to explain why the evidence is relevant and necessary." *United States v. O'Connor, supra,* 580 F.2d at 43. Otherwise, of course, the accused might be convicted because of his participation in the other crimes rather than because he is guilty beyond a reasonable doubt of the crime alleged.

■ In the present case Judge Owen admitted the subsequent other-crimes evidence only as relevant to show that Manafzadeh had the intent to commit the crime alleged (i. e., creating or causing the transportation of the six fraudulent checks) and he so instructed the jury.[14] The issue be-

12. Fed.R.Evid. 404(b) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

13. Fed.R.Evid. 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially out-

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

14. The trial court charged the jury:

"You may consider [the other-crimes evidence] only in deciding the question of the defendant's intent on the crime charged in this indictment.

.      .      .      .      .

fore the jury, however, was not Manafzadeh's intent but whether he had anything to do with the creation or deposit of the six fraudulent checks alleged in the indictment or the use of those ·checks to defraud the Chase Manhattan Bank. His counsel advised the court that if the jury found that he had created the checks or had caused them to be deposited, which was the Government's theory of the case, Manafzadeh was willing to stipulate that he had the requisite intent.[15]

There was no assertion to the effect that Manafzadeh may have participated in the creation or use of the six fraudulent checks but that he did not realize that they were written on a nonexistent account or that the signatures on the checks were unauthorized. Nor did Manafzadeh defend himself on a theory that he did not intend the six phony checks to be deposited. His defense was simply that he had nothing to do with the creation of these fraudulent checks or the use of these checks to defraud Chase Manhattan Bank.

Nor does Manafzadeh's argument that he later received as payment for bonds the five validly certified checks issued by Chase Manhattan bring intent back into the case. The trial judge specifically limited the jury to consideration of the evidence in deciding Manafzadeh's intent if it should find that he caused the transportation of the forged Chicago and Miami checks in interstate commerce[16] and further specifically instructed the jury that Manafzadeh was not being charged with receiving stolen goods.[17] Defense counsel did not argue the issue of intent to the jury, having already informed the district court that if the jury found the defendant had created the checks or caused them to be deposited, which was the Government's theory of the case, Manafzadeh would stipulate to the requisite intent.

> If, and only if you conclude beyond a reasonable doubt that Mr. Manafzadeh transported or caused the transported [sic] of the forged Chicago and Miami checks may you consider evidence of the alleged similar acts done by him on the question of whether he had criminal intent when he transported or caused the transportation of those checks."

The present case is governed by *United States v. O'Connor, supra,* and *United States v. Benedetto, supra.* In both of those cases, the defendant was a federal meat inspector accused of taking bribes, and the prosecution used evidence of alleged other bribes not charged in the indictment to bolster its case, arguing that the other-crimes evidence was relevant to intent. But in both cases, this court found that rationale unavailable. "Defendant did not claim that he took the money . . . innocently or mistakenly. He claimed that he did not take the money at all. Knowledge and intent, while technically at issue, were not really in dispute . . . ." *United States v. Benedetto, supra,* 571 F.2d at 1249, quoted in *United States v. O'Connor, supra,* 580 F.2d at 41. "[O]ther crimes evidence is inadmissible to prove intent when that issue is not really in dispute." *United States v. Williams, supra,* 577 F.2d at 191. In the present case intent was not in dispute and any doubt about its nonexistence as an issue was dispelled by the offer of the defendant to stipulate to the existence of the requisite intent if the other elements of the offense should be found. Cf. *United States v. Williams, supra,* 577 F.2d at 191 (other-crimes evidence held admissible on issue of intent where defendant's conduct was subject to innocent interpretation, he presented no evidence and did not "affirmatively take the issue of intent out of the case"). The present case is thus distinguishable from cases such as *United States v. Cavallaro, supra,* where after a defendant charged with kidnapping put his intent in issue by claiming in his defense that the victim had voluntarily accompanied him, the court held that evidence of a later abduction at gunpoint was admissible on the issue of intent.

Trial Transcript at 236–37. See also Trial Transcript at 707–08.

15. Trial Transcript at 196–97, 192–93.

16. See note 14 *supra.*

17. Trial Transcript at 726. See also Trial Transcript at 716.

■ The Government now argues for the first time on appeal that the subsequent other-crimes evidence was admissible to show Manafzadeh's knowledge at the time he received the certified Chase checks that they were fraudulently obtained from the bank.[18] However, Manafzadeh's knowledge that he was receiving proceeds fraudulently obtained from the Chase bank was not an element of the offense charged in the indictment and was not relevant to the charge against him, namely that at a much earlier point in time he had violated 18 U.S.C. § 2314 by causing the forged Miami and Chicago checks to be created and placed in interstate commerce. Cf. *United States v. Johnson*, 504 F.2d 622, 626 (7th Cir. 1974) (per curiam); *United States v. Greene*, 442 F.2d 1285, 1287 (10th Cir. 1971). Since knowledge at the later time of receipt that the proceeds had been fraudulently obtained was not a relevant issue in the case, the subsequent-acts evidence was not admissible for that collateral purpose.

■ The Government also argued at trial that the subsequent other-crimes evidence was admissible to show a plan or the absence of mistake.[19] These theories are inapplicable. The two subsequent crimes, one of which occurred some four months and the other at least seven months after the crimes alleged in the indictment, were not part of "a connected or inseparable transaction," in which all the crimes figured, nor do they constitute a continuing scheme or conspiracy. *United States v. O'Connor*, *supra*, 580 F.2d at 41. They were entirely separate, later transactions. The other-crimes evidence, therefore, simply is not probative of the existence of any plan involving the creation and transportation in interstate commerce of the fraudulent checks in the present case. On the contrary, Matavossian's testimony itself indicates that the two alleged other crimes were wholly unconnected transactions in which neither of the two other persons charged in the present indictment—Kia and Belat—played any part. Thus the evidence is not admissible under a theory of common scheme or plan. Nor was there ever any defense to the effect that if Manafzadeh had committed any of the acts alleged here, he did so by mistake or accident (to the extent the Government means something different from its argument concerning intent and knowledge).[20] The sole defense was that he did not participate at all in the acts alleged in the indictment.

■ Although the Government has not asserted here or below any of the other common justifications for use of other-crimes evidence, we note for purposes of retrial that none of them are available.[21] The evidence is not relevant to any issue of motive, opportunity or preparation, and there is no issue of identity raised in the case. Nor does the other-crimes evidence corroborate any significant or consequential testimony at trial. See *United States v. O'Connor*, *supra*, 580 F.2d at 43. The two subsequent other crimes do not demonstrate a unique scheme or pattern, which is sometimes referred to as a "signature" of the party charged. The scheme charged in the indictment involved depositing phony

18. See Appellee's Brief at 22:

"Thus, the circumstantial · nature of the Government's proof . . . put in issue Manafzadeh's state of mind at two critical points—when he received the crime's proceeds and when he touched the fraudulent Barkhordar check. . . . [A] critical part of Manafzadeh's defense would be his contention that because the checks he received from Kia bore a valid Chase certification stamp, he could not have known they were fraudulently obtained."

The other-crimes evidence is of course not probative, other than in the sense of proving "bad character," on the issue of Manafzadeh's "state of mind" when he put his fingerprint on the fraudulent check; indeed, his state of mind was not the issue at all, but rather the date on which he touched the check.

19. The trial court did not instruct the jury on either of these two theories.

20. See Appellee's Brief at 25 n.* ("mistake and 'lack of intent' are intimately related and can be merely alternative means of expressing the same defense").

21. We do not decide whether the Government could have raised these justifications here had any of them actually been available. See *O'Connor*, *supra*, 580 F.2d at 42 and n.9.

checks in a bank account and then getting the bank to issue valid certified checks based on the appearance of a sufficient balance in the account due to the fraudulent checks. The alleged May, 1977, crime involved writing fraudulent checks, forging a certification stamp on to the checks, and then using the falsely certified checks to "buy" jewels. While in both instances fraudulent checks are involved, the nature of the fraud, the method of using the checks, the type of proceeds to be obtained, and the type of target for the crime differ greatly. As for the alleged February, 1977, attempted crime, Matavossian simply did not testify in sufficient detail regarding the method to be used to defraud the bank to warrant a finding of a unique scheme. A "plan" to withdraw more money than is in an account by itself is not exactly unique. Cf. *United States v. O'Connor, supra,* 580 F.2d at 42 (nothing unique about receiving bribes in cash without spectators or conversation); *United States v. Benedetto, supra,* 571·F.2d at 1249 (same).

■ The Government also asserted below that part of the February evidence was admissible as an admission by the defendant, and that claim is again raised here. Matavossian testified that when he asked if the February scheme was dangerous he was told "it has been done several times and nothing has happened." Judge Owen denied the Government's request for a charge to the jury that this could be considered an admission, although he earlier had indicated that the statement "appears to be" an admission.[22] We agree that the statement is an admission, Fed.R.Evid. 801(d)(2). However, we leave it to the district court on retrial to decide whether the probative value of the evidence outweighs the danger of unfair prejudice. Fed.R.Evid. 403.

■ Even if the February other-act evidence is admissible as an admission but not as other-crimes evidence pursuant to Fed.R. Evid. 404(b), there is no doubt that the admission of the May subsequent act evidence was erroneous and highly prejudicial

to the defendant. It served to direct the jury's attention away from the offenses charged to a crime not charged which was not relevant to any issue in contention at trial, thus giving the jury the opportunity to draw the impermissible inference that because the defendant apparently acted unlawfully on a much later occasion and in a different way, he must have committed the earlier unlawful acts alleged in the present case. *United States v. O'Connor, supra,* 580 F.2d at 43; *United States v. Gubelman, supra,* 571 F.2d at 1256–57 (Mansfield, J., dissenting). That is precisely the inference Fed.R.Evid. 404(b) was designed to prevent. The May subsequent other-crime evidence therefore should have been excluded, and its admission requires reversal of the conviction.

■ Manafzadeh also raised four other grounds for appeal. First, during the testimony of an F.B.I. agent, the witness made reference to the defendant's exercise of his right to ask for a lawyer and his refusal to sign a waiver of rights form at the time of initial questioning; this reference was repeated twice during cross-examination. This, of course, was improper. Since we are remanding for a new trial because of the erroneous admission of subsequent other-crimes evidence, we do not have to decide whether the agent's remarks taken in context would warrant reversal; we are confident that the remarks will not be repeated at retrial.

■ Similarly, we do not have to decide appellant's claim that his arrest and search pursuant to arrest on May 27, 1977, were without probable cause. Since the arrest, search, and the evidence obtained from the search all relate solely to the subsequent other crime involving the jewelry, and the evidence of that subsequent other crime is inadmissible, the validity of the arrest and search becomes irrelevant.

■ Manafzadeh does raise two other issues which presumably will reappear at a new trial and are therefore properly before us now. First, he argues that the

---

**22.** Trial Transcript at 678, 226.

arrest and search warrants issued in February, 1977, were not supported by probable cause and that the evidence obtained pursuant to those warrants should therefore have been excluded. We find no merit in this contention. The complaint presented to the magistrate issuing the warrants alleged that Manafzadeh had conspired with Kia to violate 18 U.S.C. § 2314, that Manafzadeh [23] had purchased a checkwriting machine of the type used to make the fraudulent checks,[24] and that the proceeds of the crime had been deposited in the account of Aminco Trading Company, of which Manafzadeh was the principal, in three separate banks. The possession of the proceeds, which consisted of more than two million dollars worth of certified checks, the dispersion of those proceeds to the different banks, and the possession of a checkwriting machine capable of producing the fraudulent checks, along with the detailed information in the complaint concerning the mechanics of the fraud and the various sources for all of the information, set forth a sufficiently suspicious set of overlapping facts to warrant a finding of probable cause. Moreover, the finding of the magistrate as an independent and neutral decisionmaker on the issue of probable cause is itself deserving of weight on appellate review. *United States v. Dunloy,* 584 F.2d 6, 10 n.3 (2d Cir. 1978); *United States v. Gomez Londono,* 553 F.2d 805, 810 (2d Cir. 1977). We cannot say the magistrate was in error in finding probable cause.

Finally, Manafzadeh argues that the trial court erred by refusing to require the Government to make an offer of proof regarding defendant's alleged conviction in absentia in Iran for fraud in 1976. The defendant asserts that the trial court failed to give him "guidance" on whether or not to testify on his own behalf by refusing to rule that an Interpol telex relating to the alleged prior conviction was inadmissible and by refusing to rule that the prior conviction was inadmissible for impeachment purposes even if proven by more formal documents because of an alleged lack of due process in the Iranian court.

This claim is without merit. First, defense counsel below did not actually request a ruling on the admissibility of the Interpol telex for impeachment purposes should Manafzadeh take the stand. The record reveals that at trial the defendant requested a proffer of whatever evidence the Government intended to use as its basis for questions concerning the alleged 1976 conviction. The trial court put the Government on notice that there would have to be a good faith basis for any question asked. To the extent Manafzadeh is appealing the court's refusal to require the Government to reveal that good faith basis prior to defendant's taking the stand, we do not feel there was error.

Appellant's related assertion concerning the use of the Iranian conviction for impeachment purposes at all is also meritless. The Government had already indicated it would not offer into evidence the actual 1976 conviction, although it would "go into the facts underlying that conviction to the extent that they are similar acts and can be proved through the defendant's own mouth."[25] In any event, the trial court properly ruled that the burden was on the defendant to demonstrate why the lack of due process in obtaining the foreign conviction was so unfair that it could not be used for impeachment. *United States v. Wilson,* 556 F.2d 1177, 1178 (4th Cir.) (per curiam), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 481 (1977). Cf. *United States v. Brown,* 155 U.S.App.D.C. 177, 178, 476 F.2d 933, 934 (1973) (per curiam) (bur-

---

**23.** The complaint alleged that Manafzadeh himself had purchased the checkwriting machine, although the affidavit for a search warrant alleged that Aminco Trading Corporation purchased the machine. We do not feel that this slight inconsistency rendered the complaint unreliable for purposes of finding probable cause, since the complaint alleged that Manafzadeh was the principal of Aminco.

**24.** The magistrate did not know how many such machines existed.

**25.** Pre-Trial Conference Transcript, June 17, 1977, at 28.

den is on defense counsel to show why court should exercise discretion to hold prior conviction unavailable for impeachment); *United States v. Costa,* 425 F.2d 950, 954 (2d Cir. 1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 272 (1970) (same). Manafzadeh failed to meet that burden.

The judgment of conviction is reversed, and the case is remanded to the district court for a new trial.

LUMBARD, Circuit Judge (dissenting):

I dissent from my brothers' conclusion that the admission of evidence regarding Manafzadeh's other crimes was improper. Since I do not believe that the other objections raised warrant reversal I would affirm the conviction.

Manafzadeh's principal contention on appeal is that the trial court committed reversible error when it permitted the government to present evidence regarding his participation in two check fraud schemes subsequent in time to the crime for which he was charged. The traditional rule of the federal courts with regard to other crimes evidence, now codified as Fed.R. Evid. 404(b), is that such evidence, though inadmissible simply to show a defendant's bad character, may be used for such other purposes as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Despite the federal rule's "inclusionary" approach, Manafzadeh argues, and the majority agrees, that the evidence of his other crimes served no purpose at trial other than to demonstrate Manafzadeh's criminal disposition.

The majority is correct in its conclusion that the evidence of Manafzadeh's other crimes could not be used to show that Manafzadeh committed the acts for which he was charged with the requisite intent.[1] Manafzadeh offered to stipulate his culpable intent if it could be shown that he created or placed the six fraudulent checks in interstate commerce, and thus his state of mind at the time of his alleged criminal conduct was not truly in issue.[2]

Manafzadeh's state of mind with regard to another act, his receipt of the five certified checks that were the proceeds of the underlying fraud, was, however, very much disputed, and it is upon this issue that the evidence of Manafzadeh's other crimes was directly relevant. Manafzadeh's possession of the proceeds of the fraud, though subject to an innocent interpretation, was the strongest evidence linking him to the crime. The government's case, which was circumstantial in nature, rested largely on the natural inference that one who, without explanation, is in possession of the proceeds of a crime has participated in the crime itself.

Manafzadeh sought to counteract that inference by contending that his possession of the five certified checks was without knowledge of their fraudulent origins and was obtained in exchange for a large quantity of Iranian bonds. To buttress this claim of unwitting possession, which, given the circumstances of the alleged bond transaction, might have been thought to strain the jury's credulity, Manafzadeh empha-

1. I also agree with the majority that the other crimes evidence was not admissible as probative of Manafzadeh's state of mind at the time he touched one of the six fraudulent counter checks. The only question relevant to Manafzadeh's touching of that check was *when* he did so, not whether he knew at the time that the check was fraudulent.

2. As the majority notes, the trial court's charge to the jury, which directed that the other crimes evidence be considered only on the question of whether Manafzadeh placed the six fraudulent counter checks in interstate commerce with the requisite intent, was in error. I do not believe, however, that this error war-

rants reversal of Manafzadeh's conviction since the evidence was admissible on very similar grounds and Manafzadeh consequently received the limiting instruction to which he was entitled. Indeed, the jury was instructed not only that it could not use the other crimes evidence to draw inferences about Manafzadeh's character, the only use proscribed by 404(b), but also that it could not use the evidence for any purpose whatsoever until it first concluded beyond a reasonable doubt that Manafzadeh had caused the six fraudulent checks to be transported in interstate commerce. Under such circumstances, the prejudice, if any, to the defendant was minimal.

sized repeatedly the fact that the checks were certified, suggesting that this was a guarantee of validity upon which he was entitled to rely.

Of course, Manafzadeh's participation in other schemes in which certified checks, apparently good on their face, were used as tools of fraud, tended to discredit his claim of innocent reliance on the stamp of certification and consequently to suggest his awareness of the underlying fraud. For that reason, the evidence of Manafzadeh's other crimes was relevant not to show Manafzadeh's bad character or criminal disposition, but to explain Manafzadeh's state of mind at the time of an admitted but ambiguous act, his receipt of the proceeds of the check fraud.[3]

The majority argues that the evidence of Manafzadeh's other crimes was not admissible on the issue of knowledge because Manafzadeh's knowledge at the time he received the proceeds of the fraud "was not an element of the offense charged in the indictment and was not relevant to the charge against him, . . . ." That Manafzadeh's knowledge was, in fact, relevant to the charge against him is, I believe, fairly set out above. With regard to the statement that Manafzadeh's knowledge at the time he received the five certified checks was not an element of the offense charged, the majority's observation is correct but of no particular relevance. Other crimes evidence may be used not only to prove *directly* an element of the crime charged, or so-called consequential fact, but also "to establish a proposition, such as motive, which through a series of inferences may tend to establish the probability of a consequential fact . . . ." 2 Wein-

stein's Evidence ¶ 404[08], at 404–42 to 43 (1977).[4]

In sum, the record discloses a sophisticated scheme to defraud which was constructed to place the recipient of the fraudulently obtained funds in a position where he could claim lack of knowledge. This is the very kind of situation in which the jury gains needed enlightenment from evidence of similar schemes to which the defendant has been a party. In such circumstances, exclusion of other crimes evidence needlessly obstructs prosecution of those who would camouflage their criminal acts as ordinary commercial transactions.

Manafzadeh raises four additional grounds for appeal. Two have been rejected by the majority and I concur in their conclusion that there was probable cause for the February 23, 1977 search and arrest warrants and that there was no error in the trial court's refusal to require the government to make an offer of proof regarding Manafzadeh's alleged 1976 conviction for fraud in Iran.

Manafzadeh's other two contentions were not resolved by the majority but are equally without merit. Manafzadeh claims that his May 27, 1977 arrest outside the Barbizon Plaza Hotel was improper for two reasons: 1) that there was no probable cause; and 2) that the police should have but failed to obtain a warrant. Manafzadeh's contention that no probable cause existed for the arrest is based on the absence of evidence as to Matavossian's past reliability as an informant. See *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The short answer to that argument is that, as Manafza-

**3.** The present case is thus unlike *United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978), where only the defendant's acts and not his state of mind were in question. Here Manafzadeh's receipt of the proceeds of the crime was conceded, and his state of mind at the time was probative of whether that act was innocent or indicative of participation in the underlying fraud.

**4.** As one commentator writing some years ago put it:

"Motive, intent, absence of mistake, plan and identity are not really all on the same plane. Intent, absence of mistake, and identity are facts in issue—*facta probanda*. Motive, plan or scheme are *facta probantia*, and may tend to show any *facta probanda*." Stone, "The Rule of Exclusion of Similar Fact Evidence: America," 51 Harv.L.Rev. 988, 1026, n. 190 (1938).

deh has conceded, Matavossian was not a paid police informant but an actual accomplice to the crime. This court has recently held that "participation as an accomplice satisfie[s] the reliability standard." *United States v. Dunloy*, 584 F.2d 6, 10 (2d Cir. 1978).

Manafzadeh's claim that the failure of the police to obtain a warrant rendered his arrest invalid asks this court to extend its recent holding in *United States v. Reed*, 572 F.2d 412 (2d Cir. 1978)—that a warrantless arrest in a defendant's home, absent exigent circumstances, violates the Fourth Amendment—to a warrantless arrest in a public place. As was noted in *Reed* itself, however, an arrest in a suspect's home involves privacy interests "not present when a suspect is arrested in a public place," *Reed* at 422. The argument that because police had time to obtain a warrant they were required to do so has been explicitly rejected with respect to arrests in public places, *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), and the present case offers no reason for this court to rule otherwise.

Manafzadeh's final argument is that the trial court erred in denying his motion for a mistrial, made after a government witness referred in his testimony to Manafzadeh's exercise of his right to ask for a lawyer and his refusal to sign a waiver of rights form following his February 24, 1977 arrest. The allegedly prejudicial remarks came as the witness, FBI Special Agent Russell Healy, described the arrest:

> "We went to his office, at 1270 Avenue of the Americas, room 2401. I was standing in the hallway. Other agents went in and arrested him, brought him out, conducted a search. Myself and Special Agent Quinn escorted him downstairs in the elevator, placed him in a Bureau car. We read him his rights in the car, took him back to the office, interviewed him, read him his rights again, signed a waiver of rights—he did not sign the waiver of rights form, and he asked to call his lawyer." (Tr. 18) (emphasis added).

Following a defense objection that was overruled, Healy continued:

> "He asked to call his lawyer. We allowed him to call his lawyer and we collected a number of items from his person." (Tr. 18).

At this point, Manafzadeh moved for a mistrial on the ground that the witness had impermissibly commented on his post-arrest silence. The prosecutor indicated, however, that Healy's response had been "entirely unanticipated," and the trial court, while offering to give the jury whatever curative instruction Manafzadeh proposed, denied the motion for a mistrial.

During cross-examination, Healy made two further "references" to Manafzadeh's post-arrest silence. After being asked how long he had interviewed Manafzadeh after the arrest, Healy stated:

> "A. He just signed the waiver of rights form is all he did."

The trial court granted Manafzadeh's motion to strike the answer as unresponsive.

In response to further questioning about his post-arrest interview of Manafzadeh, Agent Healy stated:

> "Well, it depends upon how you are talking, about an interview. If reading his rights is an interview, we read him his rights." (Tr. 25).

No objection or motion to strike was made following that statement.

Manafzadeh now argues that Agent Healy's statements taken together constituted impermissible comment on his exercise of his Fifth Amendment rights. There is, of course, little doubt that Healy's remarks were improper, but they fall far short of the sort of comment that has been found to require reversal. See *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1976); *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Healy's oblique and inconsistent statements concerning Manafzadeh's post arrest behavior were more likely to have confused the jury than to have given them any clear impression that Manafzadeh refused to answer questions following his arrest. Such ambiguous remarks, particularly when not invited

by the question posed,[5] are not sufficient to warrant a mistrial. See *United States v. Natale*, 526 F.2d 1160, 1172 (2d Cir. 1975). Additional assurance that Manafzadeh was not prejudiced by Healy's testimony is provided by the fact that the trial court took prompt curative action. See *United States v. Nasta*, 398 F.2d 283, 285 (2d Cir. 1968).

I would affirm the conviction.

---

5. There is no indication that the government sought to elicit Healy's remarks. In fact, the only questions that might be thought to have invited comment on Manafzadeh's post-arrest silence were the repeated inquiries on cross-examination regarding Healy's "interview" of Manafzadeh.