UNITED STATES of America, Appellee,

v.

Kenneth ULLAND, Appellant.

No. 80–1610.

United States Court of Appeals, Eighth Circuit.

Submitted March 5, 1981.

Decided March 12, 1981.

Bruce E. Aarestad, Fargo, N. D., for defendant-appellant Kenneth Ulland.

James R. Britton, U. S. Atty., Lynn E. Crooks, Asst. U. S. Atty., Fargo, N. D., for appellee.

Aarestad, Kennelly & Kibler, Fargo, N. D., by Bruce E. Aarestad, Fargo, N. D., for appellant Kenneth Ulland.

Before HEANEY, ROSS and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

Kenneth Ulland was indicted on 12 counts of causing checks and drafts to be transported in interstate commerce, with knowledge that they had been taken by fraud, in violation of 18 U.S.C. § 2314. After a four-day trial to a jury in the United States District Court for the District of North Dakota,[1] defendant was convicted on all counts. The district court sentenced him to three years' imprisonment on each of the counts, the sentences to run concurrently. We affirm.

Defendant first argues that the district court abused its discretion in denying his motion for continuance. The indictment was returned on March 25, 1980. Ulland was arraigned on April 7, 1980. At the arraignment counsel for Ulland asked that the case not be put to trial until after another charge against Ulland had been disposed of.[2] The court agreed. It set this case for trial on May 27, 1980, two weeks after the date set for the trial in the other case. (In the event, the other case was not tried, but disposed of on a plea of guilty.) Counsel voiced no objection to this trial setting. On May 21, 1980, however, he moved for a continuance, advising the court by affidavit that defendant had not completed his "financial arrangements" with counsel until May 17, 1980. This motion

---

1. The Hon. Paul Benson, Chief Judge, presiding.

2. The other case involved tax fraud. See *United States v. Ulland*, 638 F.2d 1150 (8th Cir. 1981) (per curiam).

was denied by written order. On the morning trial was to begin, the motion for continuance was renewed in open court. Counsel asserted that he was busy with a number of matters, that the case was complex, and that he had no investigators or law clerks to help in his preparation. The motion was again denied.

█ We see no abuse of discretion in these rulings. The district courts must and do have a wide latitude in setting trial schedules and evaluating the need of parties and lawyers for continuances and other extensions of time. Those courts are in a much better position than we are to assess just how busy counsel are, what good additional time would really be to the parties, whether the party opposing the continuance would be prejudiced, and similar factors. Most lawyers feel they could use more time to prepare. Life is short, however, and delay is the bane of the courts. No doubt a lawyer's diligence is spurred after his fee is assured, but that is a matter between counsel and client, and cannot serve to compel a delay in a matter previously set for trial with ample notice.

█ Ulland next urges that the evidence was insufficient to sustain a conviction. There was no dispute that Ulland sold a quantity of sunflower seeds, represented to be a hybrid known as "894," to various elevators, and that the seeds turned out in fact to be "Peredoviks," a less desirable variety. The 894's were more expensive than the Peredoviks, and less susceptible to certain diseases. It was also common ground between the parties that various checks and drafts delivered to Ulland in payment for the seed were transported in banking channels across state lines. Ulland's defense was that he did not know that the seed delivered to the elevators in question was Peredovik. He thought that 894's were delivered, and did not learn to the contrary until some days later when the elevators began complaining that they had not gotten what they paid for. Tags and other markings on the seed bags had been changed so as to make them appear to contain 894's, but Ulland testified he did not make the changes and knew nothing of them. This testimony, if believed, would have established a defense, but there was other evidence from which the jury could reasonably have concluded that Ulland knew what was afoot all along, and that it was he who caused the tags and markings on the seed bags to be changed for purposes of deception. Among other things, there was testimony that only Ulland, among the full-time employees of Mid-State Grain and Equipment Co., had access to the company's warehouse at the time the seed bags were taken from it; that Ulland needed money in connection with several losing business ventures; that Ulland used fictitious names in telephone conversations with some of the buyers of seed; and that Ulland failed to replace some of the Peredovik seed with 894's, thus indicating that Ulland did not have enough of the 894 seed to fill the orders in the first place.

Ulland presented the testimony of Robert Wyatt, who was one of the part-time employees who loaded the seed to be driven to the purchasing elevators. According to Wyatt, a "tall guy" named "Pete" and a "short guy" named "Little Lou" changed the tags and markings on the bags before loading them into a truck. He had never seen Ulland. The jury could have interpreted Wyatt's evidence as indicating that "Pete" engineered the fraud on his own (though Ulland received its fruits), or that "Pete" was acting on instructions of his "boss," referred to as "Bob" (perhaps a reference to Robert Muus, Mid-State's office manager), or that the whole thing was a mistake (although "Pete" and "Little Lou," according to Wyatt, not only changed the tags on the seed bags so that they appeared to be 894's instead of Peredoviks, but also deliberately obliterated some identifying markings on the bags with silver paint). But Robert Muus testified he gave no instructions to anyone to alter the bags. The jury apparently believed Muus and thought it unlikely that two part-time employees, "Pete" and "Little Lou," would concoct this scheme on their own with no obvious benefit to themselves. We of

course view the evidence in the light most favorable to the government. The jury could reasonably have reached its verdict.

■ Finally, defendant challenges the admission of certain evidence over his objection. Sheldon Bartholomew, Vice-President for Sales and Production of Red River Commodities, was the government's first witness. Red River was the source of the Peredovik seed that was sold to the various elevators as 894. The agreement to purchase this seed from Red River was made on February 19, 1979, but full payment was not made until around July 28. Bartholomew was allowed to testify that a number of checks given him by Ulland in payment were returned for insufficient funds. Counsel for defendant objected to this testimony on the ground of relevance. The government took the position that the evidence bore on the questions of state of mind and fraudulent intent, and the district court agreed, overruling the objection.

The other item of evidence in question was offered through the testimony of Warren Ashton, who had been associated with Ulland in at least two business enterprises, a restaurant known as the Red Onion, and Northland Solar Fuel, Inc., an enterprise whose purpose was to build a gasohol plant in Mandan, North Dakota. Some of the elevators that had bought the Peredovik seed, thinking it to be 894, were ultimately repaid by Ulland with checks drawn by him on a Northland bank account. Ashton was permitted to testify that he was not aware that money that had been raised for the gasohol venture was being used by Ulland to pay off the elevators that had bought mislabeled seed. He added, however, that he thought Ulland had told him that some of the investors in the gasohol plant had been informed that the money was going to be used to pay off the elevators. Counsel objected to this entire line of evidence, again on the grounds of relevance. The government took the position that the evidence went to show a continuing scheme or plan, and the district court, citing Fed.R. Evid. 404(b), held that the evidence was admissible "on the question of intent, plan,

knowledge and extent of mistake or accident."

No cautionary or limiting instruction, to the effect that the jury should consider this evidence for certain purposes only, was given at the time the testimony was received, and none was requested. At the close of all the proof, however, the jury was instructed that evidence of acts of the defendant other than the acts charged in the indictment was not admissible to prove the character of the defendant in order to show that he acted in conformity therewith. The court added that the evidence could be considered on the issues of "plan, knowledge, identity, intent or absence of mistake or accident." No objection was made to this or any other instruction.

We find no error in these actions of the district court. The portions of the instruction referred to above were, in the context of this case, a correct statement of the law as set out in Fed.R.Evid. 404(b). We have recently summarized the law on this subject in *United States v. Two Eagle*, 633 F.2d 93 (8th Cir. 1980). As the opinion in that case explains, *id.* at 95–96, evidence of crimes or acts other than those charged in the indictment is admissible *either* if it completes the story of the crime on trial by proving its immediate context *or* if it qualifies under Fed.R.Evid. 404(b) as relating to intent, plan, and the like. The evidence at issue here is admissible for both reasons, as the district court observed in its order denying defendant's post-trial motions.

The crime charged here had as its context a continuing course of conduct beginning with Ulland's purchase of Peredovik from Red River and ending with his only partially successful efforts to make restitution to the elevators that had bought mislabeled seed. Much of the evidence, including a good deal that was not objected to, went to Ulland's financial troubles: three seed companies with which he was associated, Viking Seed, Mid-State Seed and Equipment, and Dakota Triticale, were having money problems. Ashton was pressing him to return

money invested in the Red Onion Restaurant, and Ulland used checks given him by the elevators for what they thought was 894 seed to make the repayment to Ashton. Ulland claimed he had made good-faith efforts to make restitution to the elevators, but his attempts to repay them were made partly with Dakota Triticale checks that were not good. Ultimately Ulland had to use funds from Northland, the gasohol venture, to pay some of the elevators. All of these facts—including Ulland's inability to pay Red River for the Peredovik for about five months—were part of the same story, necessary or at least appropriate for a full understanding of the context surrounding delivery of the mislabeled seeds. Compare *Carter v. United States*, 549 F.2d 77 (8th Cir. 1977).

In addition, the evidence was relevant to plan, knowledge, identity, intent, or absence of mistake or accident. Ulland insisted he knew nothing of the mislabeling, that it was not he who carried it out, and that it might have occurred by mistake. The jury could have inferred, on the other hand, that the sale of mislabeled seed made sense only if viewed as part of a plan by Ulland to get his hands on enough money to satisfy all his creditors. Defendant's money troubles were evidence that he had an incentive to put together such a plan. In addition, one of the elements of the crime charged was knowledge that a fraud had been committed, or, to put it another way, specific intent on the part of defendant. It is argued that intent was never put in issue—that is, defendant's theory was that he did not mislabel the seed at all, not that he did so without an intent to defraud. Intent was therefore, we are told, not the subject of material dispute, and the government should not have been allowed to introduce evidence on the subject. This argument overlooks the fact that intent was put in issue by defendant's plea of not guilty. It was the burden of the United States, as

part of its case in chief, to prove intent and every other element of the offense beyond a reasonable doubt. "The government need not await the defendant's denial of intent before offering evidence of similar acts relevant to that issue." *United States v. Adcock*, 558 F.2d 397, 402 (8th Cir. 1977).[3]

The other acts of which evidence was received here were reasonably close in time to the crime itself. The bad checks given to Red River were issued, and the Northland checks sent to the elevators, within four or five months of the delivery of the seed. These acts were also similar in purpose and effect: they were designed to get money by means that were perhaps dishonest and at least questionable. And they bore a logical relationship to the crime itself: they were necessary, in the one instance, to get the Peredovik seed in the first place, and, in the other, to pacify the elevators which had unknowingly bought it. The district court warned the jury that it first had to find beyond a reasonable doubt that defendant caused securities (here, checks and drafts) to be transported in interstate commerce, and that the securities had been taken by fraud. Only then could the other acts be considered to prove plan, knowledge, and so forth. This limiting instruction adequately protected defendant's right not to be convicted simply because the jury might think, based on evidence of acts not charged, that he was a bad man.

The judgment is affirmed.

---

3. *United States v. Manafzadeh*, 592 F.2d 81, 86–87 (2d Cir. 1979), cited by appellant, is not persuasive. There the defendant offered to stipulate to the requisite intent.