UNITED STATES of America, Appellee,

v.

Robert DeVAUGHN, Defendant-Appellant.

No. 604, Docket 78–1358.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1979.
Decided April 5, 1979.

---

Edward T. Chase, New York City, for defendant-appellant.

Mark F. Pomerantz, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MANSFIELD and TIMBERS, Circuit Judges, and WERKER, District Judge.[*]

MANSFIELD, Circuit Judge:

Robert DeVaughn[1] appeals from a judgment of conviction entered in the Southern District of New York on October 5, 1978, after a jury trial before Vincent L. Broderick, *Judge*. DeVaughn was convicted of one count of possession with intent to distribute and distribution of heroin on June 22, 1976, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. He was sentenced to four years' imprisonment, to run concurrently with an eight-year New York State sentence DeVaughn is presently serving, followed by an eight-year special parole term. DeVaughn's original trial in October, 1977, with co-defendant James "Doc" Payton ended in a mistrial. At the first re-trial in November, 1977, he was convicted,[2] but that conviction was reversed by this court on appeal because of the erroneous admission into evidence of hearsay in a taped telephone conversation between Payton and an agent of the Drug Enforcement Administration (DEA). *United-*

*ed States v. DeVaugn,* 579 F.2d 225 (2d Cir. 1978). The present conviction resulted from appellant's second re-trial.

The evidence, viewed most favorably to the Government, establishes that Mary Buckley, a DEA agent, first met James Payton at the Red Carpet Lounge in Manhattan on May 19, 1976, and the two engaged in a general discussion about narcotics. The two met again on June 10, 1976, at which time the agent proposed that in exchange for some heroin she was willing to furnish some quinine, a cutting agent, or dilutant, for heroin. A week later, on June 17, 1976, the two again met and Payton revealed that he had a friend who wanted to buy four pounds of quinine. The following day, at the Red Carpet Lounge, Buckley showed Payton a sample of the quinine. Payton then made a phone call and five minutes later DeVaughn arrived and was introduced to the agent by Payton as the friend interested in the quinine. Buckley showed the sample of quinine to DeVaughn, who examined it in a back room of the Lounge and then agreed to furnish one ounce of heroin in exchange for four pounds of quinine.[3]

On June 22, 1976, Buckley returned to the Red Carpet Lounge. Four pounds of quinine, drawn from the DEA evidence custodian, had been placed in a plastic bag inside a large white Bloomingdale's shopping bag with lips on the side and was in the trunk of her car. At the Lounge Buckley again met Payton and DeVaughn. The three drove uptown to pick up the heroin, with Buckley following the other two in her own car. Near 155th Street and Broadway, Payton pulled his car to the side of the street and approached Buckley, sitting in her car, to inform her that he thought they were being followed, pointing out several of the DEA

---

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

[1] In the indictment and at the trial below, as on a prior appeal, DeVaughn's name was incorrectly spelled as "DeVaugn."

[2] DeVaughn was tried alone at the first re-trial due to an apparent heart attack suffered by Payton. Similarly DeVaughn was tried alone at the second re-trial from which the present appeal is taken.

[3] Prior to this time Buckley and Payton had been unable to reach an agreement as to the proper exchange rate between heroin and quinine.

agents who were tailing Buckley. Payton and Buckley both drove back to the Red Carpet Lounge after Payton dropped off DeVaughn near an apartment building in the area where the agents had been spotted.

At the Lounge Payton told Buckley that DeVaughn would pick up the heroin and bring it to them. While the two waited Payton received a phone call from someone Payton identified as DeVaughn. After about a two-hour wait, DeVaughn arrived at the Lounge. DeVaughn and Payton moved to the back of the Lounge while Buckley went to her car and got the quinine. Upon her return, Payton gave Buckley the heroin. When the agent asserted that it was not a full ounce, DeVaughn responded that it was a "spoon ounce"[4] and Payton said the heroin would take a "three cut."[5]

Payton took the quinine and Buckley left. Later analysis revealed that the heroin had been cut with sugar and starch. No DEA agent testified to seeing DeVaughn with the heroin, although he was seen later on June 22, 1976, carrying a shopping bag matching the one used by Buckley to transport the quinine.

The Government at the close of its case-in-chief introduced into evidence a stipulation between the parties that on June 25, 1976, three days later, DeVaughn had in his possession 1.47 grams of a powder consisting of heroin cut with quinine. The stipulation noted that no criminal conviction had resulted from that subsequent possession. The stipulation was agreed to after the trial court overruled the defendant's objection to the admission of evidence of his possession of the powder.

## DISCUSSION

■ Appellant contends that the trial court committed reversible error in admitting into evidence his subsequent possession of heroin on June 25, 1976. We agree. "Other-crime" evidence is not admissible to show that a defendant has a bad character or propensity to commit the crime in issue, although it may be admissible for other relevant purposes. Fed.R.Evid. 404(b). See *United States v. Manafzadeh*, 592 F.2d 81, 86 (2d Cir. 1979); *United States v. Lyles*, 593 F.2d 182, 193 (2d Cir. 1979); *United States v. DeFillipo*, 590 F.2d 1228, 1240–41 (2d Cir. 1979); *United States v. Knuckles*, 581 F.2d 305, 314 (2d Cir. 1978); *United States v. O'Connor*, 580 F.2d 38, 40 (2d Cir. 1978); *United States v. Williams*, 577 F.2d 188, 191 (2d Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978); *United States v. Benedetto*, 571 F.2d 1246, 1248 (2d Cir. 1978); *United States v. Gubelman*, 571 F.2d 1252, 1254 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978).

■ To qualify for admission the other-crime evidence must be relevant to an actual issue in the case, and its probative value on that issue must not be outweighed by its unfair prejudice to the defendant. See *United States v. Manafzadeh, supra,* at 86; *United States v. DeFillipo, supra,* at 1241; *United States v. Halper*, 590 F.2d 422, 432 (2d Cir. 1978); *United States v. Knuckles, supra,* 581 F.2d at 314; *United States v. O'Connor, supra,* 580 F.2d at 40–43; *United States v. Williams, supra,* 577 F.2d at 191; *United States v. Benedetto, supra,* 571 F.2d at 1248; *United States v. Gubelman, supra,* 571 F.2d at 1254. See also Fed.R.Evid. 403. Although this court has taken the "inclusionary" approach to Rule 404(b), there is no presumption that other-crime evidence is relevant. *United States v. Manafzadeh, supra,* at 86; *United States v. DeFillipo, supra,* at 1240; *United States v. Halper, supra,* at 432; *United States v. O'Connor, supra,* 580 F.2d at 40; *United States v. Benedetto, supra,* 571 F.2d at 1248. "[C]aution and judgment are called for, and a trial judge faced with an other crimes evidence problem should require the Government to explain why the evidence is relevant and necessary." *Unit-*

---

4. A spoon ounce is an ounce measured out in spoonfuls rather than by weight.

5. This meant the heroin could be diluted three times with quinine and still have sufficient strength to be saleable on the street.

ed States v. O'Connor, supra, 580 F.2d at 43, quoted in United States v. Lyles, supra, at 196; United States v. Manafzadeh, supra, at 86–87. The fear, of course, is that "the accused might be convicted because of his participation in the other crime rather than because he is guilty beyond a reasonable doubt of the crime alleged." United States v. Manafzadeh, supra, at 86.

■ In the instant case, the Government argues that the other-crime evidence was admissible to prove DeVaughn's identity as the person present at the Lounge on June 22 when the exchange occurred and to corroborate Agent Buckley's testimony that a heroin-quinine exchange had occurred at that time. Appellant contends that both identity and corroboration would have been established by his offer early in the trial to concede that he had in fact received the quinine from Buckley. The Government refused to accept this offer in lieu of the evidence of his subsequent possession of heroin, arguing that the concession would only corroborate Buckley's testimony that quinine passed hands, whereas his subsequent possession of heroin would also corroborate her testimony that heroin was exchanged as well.

■ Since the concession that was offered would have established beyond question DeVaughn's presence with the others in the Lounge at the time of the alleged exchange and his identity as the recipient of the quinine, thus removing identity as an issue, the other-crime evidence was not admissible to prove identity, see United States v. Manafzadeh, supra, at 88; cf. United States v. Williams, supra, 577 F.2d at 191, and could only have been offered for purposes of corroboration, provided "the corroboration is direct and the matter corroborated is significant." United States v. Williams, supra, 577 F.2d at 192; United States v. O'Connor, supra, 580 F.2d at 43; United States v. Manafzadeh, supra, at 88. Such evidence will not be admitted under a theory of corroboration to show that a defendant is a "bad man likely to have committed the crimes charged in the indictment,"

United States v. O'Connor, supra, 580 F.2d at 43.

■ Applying these basic principles, appellant's possession of a heroin mixture on June 25 would hardly be admissible to show that he probably possessed and exchanged heroin for quinine three days earlier. Such an inference would rest upon an impermissible basis, namely, that because appellant possessed heroin on June 25 he is a person of "bad character or [had a] propensity to commit the crime in issue" and therefore probably committed the crime charged against him (possession and exchange on June 22). See United States v. Manafzadeh, supra, at 86. Indeed, this other-crime evidence was excluded at the second trial because no analysis had been made of the cutting agent.[6]

■ At the latest trial the Government was able to show that the heroin possessed by appellant on June 25 had been diluted with quinine. On the basis of this additional proof the prosecution persuaded the trial judge to admit it on the theory that the presence of quinine in the June 25 mixture tended to corroborate Agent Buckley's testimony that she had furnished quinine three days earlier to appellant and that the combination of heroin and quinine in the June 25 mixture corroborated her testimony that on June 22 she received a "spoon ounce" of mixed heroin for the quinine. As a final fillip the Government argued that the combined evidence indicates that on June 22 appellant had heroin (mixed with starch and sugar) but needed quinine, which he must have obtained from Agent Buckley on June 22 and then used to prepare the heroin-quinine mixture found in his possession on June 25th.

At first blush the Government's analysis would indicate that the other-crime evidence (i. e., the June 25th possession) corroborated Agent Buckley's testimony. However, it was not "direct" corroboration as that term is used in United States v. O'Connor, supra, 580 F.2d at 43. To be

---

6. The other-crime evidence was not even offered by the Government at the first trial.

directly corroborative of her testimony that she furnished the quinine, it would be necessary to show that, despite the existence of large amounts of different qualities of quinine in the world, the quinine in the June 25th mixture was the same quality and chemical analysis as the quinine she testified to having furnished on June 22. The mere fact that the June 25th heroin mixture contained quinine as its dilutant would hardly identify the quinine as that supplied by Agent Buckley on June 22, in view of the parties' stipulation that the Government's expert witness would have testified that "approximately 20 percent" of all the heroin that witness analyzed in 1976 was cut with quinine. That very high figure substantially undermines the probative value of the June 25 evidence because it shows that the June 25 mixture could easily have come from some other source, which undercuts the inference that the quinine in the June 25 heroin was the same quinine that Agent Buckley had supplied on June 22. Nevertheless, the Government argued before the jury and before this court:

> "Three days later, he was found again with heroin but this time it was cut with quinine and I submit to you that the quinine that is contained in these two little envelopes is part of the four pounds of quinine that Agent Buckley supplied to Mr. DeVaugn on June 22nd." Trial Transcript at 198.

█ In the absence of any evidence in the record of any comparative chemical analysis of the June 22 and June 25 quinines demonstrating that the samples were the same or sufficiently identical to warrant an inference that they came from the same source, the probative value of the other-crime evidence was entirely too ephemeral to permit its introduction as corroborative evidence. The danger was too great that appellant "might be convicted because of his participation in the [June 25 possession] rather than because he is guilty beyond a reasonable doubt of the crime alleged," *United States v. Manafzadeh, supra,* at 86. The error cannot, therefore, be labeled as harmless.

Appellant also raises a second issue on appeal—that the district court lacked jurisdiction to conduct the last re-trial because the mandate had not yet issued from this court on a prior appeal. Our decision reversing the conviction resulting from the second trial was filed on July 17, 1978. The Government moved for an extension of time within which to file a petition for rehearing, which was granted on August 3, 1978, giving the Government an extension until August 21, 1978.[7] Issuance of this court's mandate was stayed because of that extension. On August 14, 1978, the third trial began, and on August 16 defense counsel advised the district court that this court's mandate still had not issued. Although the matter was discussed before the trial court, no motion for a mistrial was made, and the trial continued. The jury returned its guilty verdict on August 17, 1978. The Government then, on August 22, moved in this court for issuance of the mandate on the prior reversal *nunc pro tunc* as of 9:00 A.M. on August 14, 1978, one hour before the third trial began. That motion was granted by this court on September 12, 1978.

Appellant argues that jurisdiction could not be conferred upon the district court after the fact through issuance of the mandate *nunc pro tunc.* He also asserts that reprosecution would be barred by the Double Jeopardy Clause of the Fifth Amendment.

It is regrettable that the Government, apparently due to a breakdown in internal communications, allowed a situation to arise whereby it was reprosecuting a case in the district court and attempting to preserve its appellate options at the same time. We trust that the Government will not permit a recurrence.

█ In light of our reversal of the present conviction due to the improper admission of other-crime evidence, however, we need not pass upon the validity of the *nunc pro tunc* order. It is settled that

---

7. No petition for rehearing was in fact filed by the Government.

when a defendant by appeal successfully challenges a prior conviction the Double Jeopardy Clause does not bar reprosecution. See, e.g., *Abney v. United States,* 431 U.S. 651, 665, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Ludwig v. Massachusetts,* 427 U.S. 618, 630–32, 96 S.Ct. 2781, 49 L.Ed.2d 732 (1976). Thus if the *nunc pro tunc* order is valid, there is no constitutional difficulty with the present reversal and remand for a new trial. If, on the other hand, the *nunc pro tunc* order is ineffective, as appellant contends, and there was no jurisdiction in the district court at the time of this trial, the present conviction is void and there is still no double jeopardy bar to re-trial. See *United States v. Sabella,* 272 F.2d 206, 209 (2d Cir. 1959); *Woodring v. United States,* 337 F.2d 235, 236–37 (9th Cir. 1964), *cert. denied,* 380 U.S. 933, 85 S.Ct. 937, 13 L.Ed.2d 820 (1965); *United States v. Weissman,* 434 F.2d 175, 179 (8th Cir. 1970), *cert. denied,* 401 U.S. 982, 91 S.Ct. 1190, 28 L.Ed.2d 334 (1971); cf. *United States v. Ball,* 163 U.S. 662, 669, 16 S.Ct. 1192, 41 L.Ed. 300 (1896) (an acquittal in a criminal trial before a court with no jurisdiction is absolutely void and therefore not a bar to subsequent prosecution). It therefore becomes unnecessary to determine the validity of the *nunc pro tunc* order. A remand for a new trial is warranted on other grounds and not constitutionally barred, regardless of the outcome of appellant's jurisdictional argument.

The judgment is reversed and the case is remanded for a new trial.