UNITED STATES of America, Appellee,

v.

Arthur GIBBONS, a/k/a "Joe Gibbons,"
a/k/a "Joe the Barber" and Leroy
Perry, Appellants.

Nos. 117, 250, Dockets 78–1189, 78–1196.

United States Court of Appeals,
Second Circuit.

Argued Sept. 11, 1978.

Decided June 25, 1979.

Lawrence K. Feitell, New York City, for appellant Gibbons.

Lawrence W. Kessler, Hempstead, N. Y., for appellant Perry.

Jane W. Parver, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., and Howard W. Goldstein, Asst. U. S. Atty., S. D. N. Y., New York City, of counsel), for appellee.

Before OAKES, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

Arthur Gibbons and Leroy Perry appeal from judgments of conviction entered in the District Court for the Southern District of New York (Hon. Robert L. Carter, Judge) after a jury verdict of guilty. The

indictment charged appellants and James Earl Cox and Sidney Williams with conspiring to distribute and possess with intent to distribute unknown quantities of heroin by means of actual distributions of heroin and by purchases of mannite for use in cutting or diluting heroin, in violation of 21 U.S.C. § 846.[1]

*Facts*

From 1974, Sidney Williams and one Leroy Roper began a partnership selling heroin. The heroin was marketed in glassine bags referred to as "quarters," each containing $\frac{1}{20}$th to $\frac{1}{25}$th of an ounce of "street" heroin. At first, Williams and Roper were supplied by a John Bazemore, but after 1976, when Bazemore died, deliveries were made by James Earl Cox. Both Bazemore and Cox were deliverymen: as early as 1976, Roper was told by Bazemore that the source of supply was Arthur Gibbons, who owned a building at 2459 Eighth Avenue which contained a barbershop and a backroom "social club." And when Bazemore died in the fall of 1976, Williams got in touch with Gibbons and arranged for Cox to resume heroin deliveries.

Roper was arrested in March 1977, at which time he agreed to cooperate with agents of the New York Drug Enforcement Task Force. His first effort on the Task Force's behalf was to arrange a meeting between Williams and an undercover detective which culminated in the sale to the detective by Williams of 25 quarters of heroin originally supplied by Gibbons. Throughout the spring and summer Roper kept drug enforcement agents informed as to transfers of heroin from Cox to Williams. He also recorded telephone conversations with Cox, meetings with Cox or Williams, and meetings with Gibbons; these last recordings turned out to be unintelligible. By means of these tapes, the government agents learned of price disputes between the street distributors and their sup-

plier. Cox and Gibbons complained that Williams and Roper were in arrears in their payments for past deliveries, and Williams and Roper asserted that they had been cheated by having been charged a higher "wholesale" price for heroin than were other street merchants.

During this period, Roper informed Cox and Williams that he knew someone who could provide material used for diluting or "cutting" wholesale level heroin to the less pure "street grade." This provider was actually an undercover agent. Cox originally showed some interest because, as he put it, the "old man" was short of "cut," having sold some on the side. Testimony at trial indicated that the "old man" was a nickname for Leroy Perry, a superintendent at Gibbons' building at 2459 Eighth Avenue.

Roper's first effort to have an undercover agent sell Cox mannite and quinine—two cutting materials—did not bear fruit. But toward the end of August, Cox informed Roper that Gibbons was interested in procuring a quantity of mannite. Another undercover agent was provided with mannite—itself not an illicit substance, but an infant laxative—and a deal was concluded for the sale of five cases. On August 25 Roper and the agent arrived at the social club in Gibbons' building. Cox greeted the agent at the door and the latter left briefly and returned with six boxes of mannite. Perry stood at the bar in the club counting money. Perry asked Cox, "Should be 2700, right?" and handed Cox the cash. Cox and the agent then discussed the disposition of one of the cases of mannite that was extra, and the agent decided to remove it rather than to leave it on consignment. Perry chimed in: "Yes, don't leave nothing here, take it with you."

Roper and the agent departed, as did Cox a short time later. Perry then left but returned shortly. Perry came out of the barbershop with a white plastic bag large enough to have contained one of the boxes of mannite. He returned to the shop, which

---

1. Judge Carter sentenced Gibbons to a fifteen-year term of imprisonment to be followed by lifetime special parole. Perry was sentenced to six months' imprisonment to be followed by three years' special parole.

was then entered by Gibbons and another man. About one hour later Gibbons left and then Perry left.

Several days after the delivery, Roper met with Gibbons in the barbershop. Gibbons informed Roper that he had purchased the extra mannite because he was expecting a shipment of heroin but that the heroin had not arrived. He told Roper that further orders of mannite would depend upon the arrival of the heroin. In mid-September, some two weeks later, Roper spoke with Perry at the barbershop and was told that the five cases of mannite were still on hand.

Gibbons, Perry, Cox and Williams were arrested on January 18 and 19, 1978. When Perry was arrested, 3/10 of a gram of cocaine was found on his person, wrapped in a dollar bill. Shortly after his arrest, Gibbons confessed to involvement in narcotics trafficking and recounted distribution procedures to the police. At trial, Gibbons did not testify nor did he present evidence. Perry admitted giving Cox money in the "social hall" on August 25, 1977, but denied knowing what mannite is. He also denied seeing Gibbons on August 25. Perry conceded that he vaguely understood what the term "cut" meant, but denied that he knew how cocaine or heroin is cut.

Within days after the commencement of trial, Williams and Cox pleaded guilty and dropped out of the proceedings.

## I

Gibbons contends: (1) that the District Judge's charge on conspiracy was erroneous; (2) that the court's instructions to the jury regarding the codefendants who pleaded guilty during trial were erroneous; (3) that Judge Carter showed racial bias in sentencing against appellant, a Negro; and (4) that the Judge presided over the trial in a manner unfair to appellant Gibbons.

Perry contends: (1) that the Judge improperly admitted prejudicial irrelevant evidence of a subsequent similar act, and (2) that the appellants' statutory right to exercise peremptory challenges was improperly curtailed by depriving appellants of essential information about prospective jurors.

We find all these contentions without merit and affirm both convictions.

## II

■ Gibbons attacks a portion of the charge as prejudicial error. The sentence challenged reads:

Proof concerning the accomplishment of the objects of a conspiracy may be the most persuasive evidence of the existence of the conspiracy itself: Success of the venture, if you believe that it was successful, may be the best proof of the existence of a conspiracy.

Counsel timely objected on the ground that this statement required the addition of a converse statement "that proof of the substantive crime does not require a conclusion that a conspiracy existed. . . ." The Judge refused to amend his charge, which we note is a charge commonly used. Actually the Judge simply charged that success of the venture "may be" the best proof of the existence of the conspiracy, which, indeed, it may be. He also charged, conversely, that "there is no need to prove that the substantive crime . . . has been committed." Reading the charge as a whole, see *Cupp v. Naughten*, 414 U.S. 141, 93 S.Ct. 1926, 36 L.Ed.2d 408 (1973); *United States v. Nemes*, 555 F.2d 51, 52 (2d Cir. 1977), we note that the Judge charged that, in order to convict, the jury had to find that there was an agreement, the purpose of which was to distribute or possess with intent to distribute Schedule I controlled substances, that the defendant knowingly and wilfully became a member of the conspiracy and that one of the conspirators committed an overt act. He charged particularly that "mere similarity of conduct" or discussion of "common aims" does not establish the existence of the conspiracy. He even charged that "mere knowledge or approval of the conspiratorial acts . . . or mere willing participation in the acts with the alleged co-conspirators, knowing in a general way that their intention was to break the law" is not enough.

■ We are convinced that the judge made it abundantly clear that success by one conspirator in selling narcotics to a police detective was not enough to permit the jury to find a codefendant who did not participate in the sale guilty of conspiracy *without more.* By clearly charging the elements required to convict for the crime of conspiracy, the court dispelled any such erroneous view. Circumstantial evidence of criminal acts may, of course, be used inferentially to prove the existence of the conspiracy. *United States v. Sperling,* 506 F.2d 1323, 1341–42 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Turcotte,* 515 F.2d 145, 150 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975).

## III

The indictment named four defendants, all of whom appeared for trial. On the second day of trial, Williams pleaded guilty and the court advised the jury that he was no longer a part of the proceedings and that they were not to speculate on why he was no longer present. Later, Cox pleaded guilty and the court made the same statement to the jury. These statements are not challenged.

Unfortunately, the Judge told counsel just before the summations: "I think that I am obligated to tell the jury that they pleaded guilty and I am going to do that." Counsel promptly objected.

Later the Judge stated that he had checked "the Second Circuit opinion and while my announcement that these men had pleaded or with limited instructions [sic] is not regarded as error, the Second Circuit prefers that one not do that." Accordingly, the Judge stated: "I will adhere to what I have done in the past and indicate that they are not to speculate about that."

In its charge, the court told the jury:

As I have indicated to you earlier, this case has been disposed of as to the defendants Sidney Williams and James Earl Cox. You are not to be concerned with them, nor should you speculate as to the reasons why they are no longer on trial before you. The disposition of the case as to them should not in any way affect or influence your verdict with respect to the remaining two defendants. You must base your verdict as to each of them solely on the evidence against them, or the lack of evidence.

Counsel objected to this portion of the charge arguing that "the inference is raised that it was disposed of in the way of a plea."

■ While a "disposition" of a case may mean only a plea of guilty to a lawyer practicing criminal law, it is not likely that it means that to a lay juror. We have, incidentally, not commented unfavorably on a statement by a trial judge that a codefendant's case " 'has been *disposed of* without the necessity of the jury determining it.' " *United States v. McAvoy,* 574 F.2d 718, 722 & n.3 (2d Cir. 1978) (emphasis added). It would be better practice to avoid reference to the circumstance that a codefendant has pleaded guilty or that his case has been "disposed of." So far as reversible error is concerned, however, we have not reversed even where the judge specifically told the jury that codefendants had pleaded guilty but accompanied his statement with appropriate cautionary instructions such as those employed here. *See United States v. Toliver,* 541 F.2d 958, 967 (2d Cir. 1976); *United States v. Kelly,* 349 F.2d 720, 767–68 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966).

## IV

■ The attacks on Judge Carter's conduct of the trial are rejected, since the cited statements, even cumulated, did not exceed the bounds of propriety. Nor is there any indication of an improper motive in sentencing appellant Gibbons.

## V

■ Evidence was admitted against Perry alone that when he was arrested over

four months after the delivery of the mannite Perry had three-tenths of a gram of cocaine wrapped in a one dollar bill. Counsel objected to the evidence upon the ground that it did not "show knowledge about the sale and distribution of heroin." The Government argued that, although the cocaine that was found on Perry was not cut with mannite but with other substances, it nevertheless was admissible to show knowledge and intent respecting the heroin conspiracy. In the words of the Assistant United States Attorney, "His usage of the drug and the fact that it is cut demonstrates his awareness of what cut is . . . ." Counsel rejoined that it is a question of fact "whether this possession of cocaine does in fact have probative value towards showing knowledge or intent about the pertinent issues in the charge here, which is the heroin sale." He continued to argue, moreover, that the prejudicial nature of this evidence far outweighed its probative value.

At that point, the Judge said: "I think it is not for me to determine. It is for the jury to determine under instructions for [sic] me." The Judge then stated, in the same vein:

> The argument is he didn't know what it was. That was apparently your statement of the testimony. And even though what was found on him was cocaine and not heroin, it does appear to me that the jury is entitled to that information as to whether they would determine that he is the innocent, unknowing servant to Mr. Gibbons, which the defense depicted, and I don't think I would be entitled to do that in *the exercise of my discretion*. I think, to the contrary, it would be an act of bias and prejudice because I would be

throwing a barrier into this prosecution's case and I think they are entitled to have the jury decide it. . . . (emphasis added)

The Judge later twice gave an appropriate cautionary instruction.[2]

Though the language quoted may imply that the Judge abdicated his function to balance probative value and prejudicial effect, a careful reading convinces us that what he intended was a judicial ruling that the evidence was, indeed, relevant to show knowledge about narcotics on the part of Perry, who was taking the position that he did not know what mannite was used for.

In the circumstances, we treat his ruling as if he had explicitly decided that the evidence was relevant and not prejudicial.

This brings us directly to the scope of our review in matters involving Federal Evidence Rules 403 and 404(b). If relevance were to be determined by strict logic alone, it may be that the possession of a small quantity of cocaine for personal use does not tend to show knowledge that mannite, commonly used as an infant laxative, is used to "cut" heroin. Yet, in a more general sense, Perry did pay for the mannite and his knowledge of what it was used for was in issue. That Perry was a drug user himself, and that Perry was more "streetwise" then he pretended, was relevant on that issue, for "streetwise" persons would be more likely than the average individual to know that narcotics distributors use mannite to cut heroin.

This is not a case where the possession of a controlled substance not charged in the indictment is introduced to prove an identity that is conceded, or to corroborate an

---

2. "Now, you will recall that during the course of the trial a quantity of cocaine which was alleged to have been found on Mr. Perry at the time of his arrest was admitted into evidence. Let me now repeat the cautionary instruction I gave you earlier when that evidence was admitted. The evidence was admitted for a very limited purpose.

"First of all, it can only be considered by you with respect to Mr. Perry. It has no relevance whatsoever to Mr. Gibbons. In addition, Mr. Perry is not charged with pos-

session of cocaine and that issue is not before you. Therefore, you cannot use this evidence to determine whether Mr. Perry committed any of the acts charged in the indictment.

"However, if, and only if, you determine that Mr. Perry did commit the acts charged in the indictment, then you may but you are not obliged to consider the evidence of cocaine in determining the knowledge, intent and wilfulness with which he committed the acts charged."

Transcript at 1297–98.

accomplice's testimony. *Cf. United States v. DeVaughn*, 601 F.2d 42 (2d Cir. 1979).

Considering the measure of discretion which, under the rule of the Circuit, we generally allow trial judges, we cannot say that Judge Carter abused his discretion. *United States v. Robinson*, 560 F.2d 507, 515 (2d Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

In this connection, there was a colorable basis to believe that the jury might have been wondering whether, in view of his close association with Gibbons, a large purveyor, Perry knew something about the narcotics business and, specifically, about "cut." There was just enough here to permit the jury to weigh the similar act evidence as bearing upon his knowledge of the uses of mannite.

### VI

Finally, it is contended that Judge Carter improperly denied the defendants' request to ask potential jurors more specific questions about their place of residence in New York than simply in which borough they lived. It is asserted that without such information the defendants could not effectively exercise their right of peremptory challenges to jurors.

We have recently dealt with the adequacy of the *voir dire* for peremptory challenges. *See United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979). We there held, after ten months of gestation, that the refusal of the trial judge to allow disclosure of the names and addresses of the jury panel and his refusal to inquire into their "ethnic" background did not deprive the defendants of a fair trial. Appellants conceded in *Barnes* that "it is not asserted that the trial court's failure to disclose jurors' exact residence addresses, standing alone, warrants reversal." *See Barnes,* at 137. The thrust of the appeal in *Barnes* related to the judge's refusal to inquire into "ethnic" background. Judge Meskill, dissenting, agreed that the failure to disclose the names and addresses of the jurors did not deprive the defendants of a fair trial. His dissent turned on the failure of the trial judge to inquire, in reasonable fashion, into the jurors' ethnic and religious backgrounds.

Here no such claim is made. The names of the jurors were exposed, but their street addresses were withheld. Counsel for the defendants requested disclosure of the community in which each juror lived, which was refused. This is now claimed to be error.

The question, while innocuous on its face, had a deeper import. If there is a sound reason for withholding the addresses of the jury panel whose names were given in this narcotics case, there is a similar reason for withholding disclosure of the neighborhood or community in which the potential jurors reside. That is because, except for persons with particularly common names, there is easy resort to the telephone directory to find the address of the particular juror.

It is true that there may be extraordinary cases when the "community" may become relevant to the question of bias, as was claimed when a resident of the U.S. Virgin Islands was accused of murdering a resident of the British Virgin Islands. It was argued that there was bad blood between the natives of such islands and that counsel were entitled to know whether a juror was a naturalized citizen who came from a British island. Even there the Third Circuit held that the failure to disclose the community of former residence did not deprive the defendant of a fair trial. *Government of Virgin Islands v. Felix*, 569 F.2d 1274 (3d Cir. 1978).

We think that ours is an easier case than *Barnes.* Just as the Third Circuit was not impressed by a general claim of "down island" prejudice, here the generalization urged is that if a white person lived in a black neighborhood he was more likely to have had "unpleasant experiences with black youths," and might, therefore, be more subject to peremptory challenge. But a questioning about unpleasant experiences with blacks was neither proposed by counsel nor denied by the judge. Such questioning along racial prejudice lines, even if it produced no challenge for cause, might well have elicited a peremptory challenge.

█ The point is that no archetypal questions were proposed that were fundamental to peremptory challenges as distinguished from challenges for cause. In the peremptory challenge, the defendant need give no reason. But that can hardly mean that every question suggested by counsel must be put by the trial judge because it might conceivably lead to a peremptory challenge. In *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973),[3] the defendant, a bearded black person, requested a *voir dire* question on whether a juror would be prejudiced against him because he was a Negro and another question of possible prejudice because he was bearded. The court reversed the conviction for failure to ask the former question but held it within the judge's discretion to refuse to ask the latter question. While one may sympathize with the view of the dissenting justices that prejudice against beards was so rampant at the time that a serious question of actual prejudice against bearded persons should also have been explored, it was recognized that "a defendant must [not] be permitted to propound any question" he chooses, 409 U.S. at 533, 93 S.Ct. 848, 854 (opinion of Mr. Justice Marshall), and that there is a countervailing state interest in "the avoidance of jury intimidation." *Id.*

█ In sum, the right of the peremptory challenge does not command a right to the peremptory question. Whatever the attorney's power to strike a number of venirepersons at will may be, to recognize a correlative right to question at will—without in any way identifying the motivating concern—would strip the judge of his control over the proceedings. Any question could be labelled necessary for some unspoken element in the decision to challenge peremptorily.

█ To be sure, it might be an abuse of discretion utterly to foreclose a line of inquiry necessary to lay the groundwork for peremptory challenges, even in the face of countervailing policies. *See United States v. Segal*, 534 F.2d 578, 581 (3d Cir. 1976); *United States v. Dellinger*, 472 F.2d 340, 368 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *cf. United States v. Robinson*, 154 U.S.App. D.C. 265, 475 F.2d 376, 381 (1973) (where a case has racial overtones, "trial court must . . . govern the *voir dire* accordingly."). But this is not a case where any such foreclosure occurred. There is no indication that the Judge would have refused to explore possible racial prejudice or other bias, provided questions could have been posed which would have avoided disclosure of the jurors' residences, or the possibility of a strong indication of residence.[4] Rather, the defendants do not appear to have urged a general inquiry into any particular prejudice, either by suggesting, for example, that the case had racial overtones, *see Ham, supra*, or by requesting "appropriate questions designed to identify racial prejudice," *Ristaino, supra*, 424 U.S. at 597 n.9, 96 S.Ct. at 1022 (dictum), or any other bias that has "become evident, through experience with juries, and [has] come to be recognized as a proper subject for the *voir dire*."[5] *Robinson, supra*, 154 U.S.App.D.C. at 270, 475 F.2d at 381. Nor did the defendants indicate any less usual, but specifically applicable, concern about a "particularized and concrete" prejudice, *Felix, supra*, at 1277, as a foundation for questioning, *see Robinson, supra*, 154 U.S.App.D.C. at 270, 475 F.2d at 381. Had they done so, Judge Carter would have had the opportunity to develop alternative means of probing for any bias about which the defendants were concerned, with-

---

**3.** *Ham* was held not to have announced "a requirement of universal applicability" in *Ristaino v. Ross*, 424 U.S. 589, 596, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976).

**4.** In *noncapital* cases, there is no statutory requirement that addresses of veniremen be provided, *compare* 28 U.S.C. § 1863(b)(8) (no mention of disclosure of addresses) *with* 18 U.S.C. § 3432 (person charged with capital offense must be provided with list of veniremen and "place[s] of abode.").

**5.** In fact, Judge Carter searchingly questioned the veniremen as to any prior brushes with the law or any relationships with law enforcement personnel, thus responding to possible biases which have "become evident, through experience with juries. . . . ."

out encountering the problem posed by the defendants' formulation of the query. *Compare Felix, supra,* at 1276.

 In light of the broad discretion of the trial judge in conducting jury *voir dire,* the legitimate problems that revealing information on the location of the jurors' homes would raise, and the failure of the defendants to identify specific concerns or prejudices which they hoped to uncover, we hold that Judge Carter did not improperly refuse to put the question about residence to the jurors.

Affirmed.

MESKILL, Circuit Judge, concurring:

I concur in the result. Because I dissented in *United States v. Barnes,* 604 F.2d 121 (2d Cir. 1979), I wish to record separately my views regarding the district court's conduct of the *voir dire* in this case.

In *Barnes* we were asked to review a "cluster of decisions" [1] rendered by the trial judge, *sua sponte,* in connection with the *voir dire* examination of prospective jurors. These decisions included the refusal to disclose or inquire into the names, addresses, "communities," [2] ethnic backgrounds and religious backgrounds of the prospective jurors. All independent investigation of the prospective jurors was expressly prohibited. The jury that was eventually selected was sequestered. On appeal, the defendants argued that the cumulative effect of these decisions was to deny them the ability to exercise meaningfully their right of peremptory challenge and that this deprivation mandated reversal. The majority rejected this argument, premising its decision on the "basic rule" that "a trial judge's discretion will be upheld unless a defendant has been precluded from obtaining an impartial jury," at 138, and concluding:

> [W]hen questioning can be deemed fair—when a jury can be deemed free of bias—a trial judge's decision as to the conduct of the *voir dire* will be upheld.

As long as there is some questioning as to identifiable issues connected in some way with persons, places, or things likely to arise during the trial, an appellate court faced with a cold record should be satisfied that justice has been done.

. . . .

As long as a defendant's substantial rights are protected by a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

At 139 and 140. The majority went on to conclude that only "the essentials of the case should be the subject of inquiry" on the *voir dire*—"[i]f that demand is satisfied, then so will have been the rights of the parties." At 143. I disagreed with the majority then, and I disagree with it now. Nonetheless, *Barnes* is the law of this Circuit, and we are bound by it.

Under *Barnes,* Perry clearly is not entitled to prevail. Whereas Barnes and his co-defendants could not discover the names, addresses, "communities," ethnic backgrounds or religious backgrounds of the prospective jurors, and could not independently investigate the prospective jurors, Perry was given the name of each juror, as well as the juror's town of residence (if outside New York City) or borough of residence (if inside New York City), as well as the name of any town or borough resided in within the past five years. Perry did not ask for, and does not argue that he should have been given, either the specific addresses or ethnic and religious backgrounds of the prospective jurors; he argues only that he should have been told the "community" in which the prospective jurors resided. Perry was not prohibited from independently investigating the prospective jurors. The jury in *Barnes* was sequestered; the jury here was not. To state the differences between the cases is to make obvious why Perry is not entitled to reversal.

---

1. *See United States v. Barnes, supra,* at 174 (Meskill, J., dissenting).

2. On the *voir dire,* the prospective jurors were required to disclose in which of the counties of the Southern District they lived.

Even if my dissent in *Barnes* represented the law of this Circuit, however, Perry would not be entitled to prevail. Although "it is the normal and better practice to provide to the government and the accused a list of prospective jurors and their addresses," *United States v. Barnes, supra*, at 172 (Meskill, J., dissenting), *citing* ABA Standards, Trial by Jury § 2.2 (1968) & Commentary at 60–61, and although I am not at all clear why the trial judge in this case declined to inquire as to the prospective jurors' "community," I cannot conclude on this record that the "due administration of justice" was interfered with, *Pointer v. United States*, 151 U.S. 396, 409, 14 S.Ct. 410, 28 L.Ed. 208 (1894), or that "the essential demands of fairness" were not satisfied, *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). Here, Perry was given the name of each prospective juror. With a minimum of effort he would likely have secured the specific addresses of the prospective jurors. Given this, Perry's complaint that he should have been told the "community" of each prospective juror's residence rings hollow indeed. That Perry might have exercised a peremptory challenge based on information that he did not know but probably could have found out does not mean that the district court's conduct of the *voir dire* was a "system for the empanelling of a jury that pre[v]ent[ed] or embarrasse[d] the full, unrestricted exercise" of the right to peremptory challenge. *Pointer v. United States, supra*, 151 U.S. at 408, 14 S.Ct. at 414, *St. Clair v. United States*, 154 U.S. 134, 148, 14 S.Ct. 1002, 38 L.Ed. 936 (1894).

Neither do I believe that the admission of evidence of Perry's possession of cocaine subsequent to the conspiracy requires reversal. Even if the admission of evidence of Perry's possession of cocaine at the time of his arrest constituted error under Fed.R. Evid. 404(b) and 403, it was, given the nature of that evidence and the trial judge's instructions to the jury, harmless error. *See United States v. Quinto*, 582 F.2d 224, 235 (2d Cir. 1978); *United States v. Corey*, 566 F.2d 429, 432 (2d Cir. 1977).

For these reasons I concur in the result announced today.

OAKES, Circuit Judge (dissenting):

I dissent.

It seems to me that it was an abuse of discretion for the trial judge to decline to inquire as to prospective jurors' "community" or neighborhood of residence. While it is true that here the jurors' names were disclosed as well as the jurors' town of residence (if outside New York City) or borough of residence (if inside New York City), some of those towns and four of those boroughs are rather large; knowing that someone is from Manhattan does not give counsel contemplating a peremptory challenge the same insight as knowing he is from midtown Manhattan, Murray Hill, Kips Bay, the East Village, Chelsea, the Lower East Side, Yorkville, Soho, etc. Furthermore, I must reluctantly disagree with Judge Meskill that "[w]ith a minimum of effort he [Perry] would likely have secured the specific addresses of the prospective juror." It is not the case that addresses of the vast majority of people residing in the New York City area can be discovered merely by searching the appropriate phone book. Many people are unlisted, many people have common names, and many people have telephones listed under names, including last names, other than their own. I suppose that there are even some people who do not have telephones. Knowing where the prospective juror is from is of no little importance.[1]

I also think that admission of evidence of Perry's possession of cocaine subsequent to the conspiracy was erroneous and that error was harmful. It was erroneous because it was irrelevant to any disputed issue. Perry's defense was that he did not know that the transaction in the barber shop involved the sale of mannite, which is used as "cut" for heroin. I do not know how it may be maintained that evidence of subsequent possession of cocaine, which is apparently

1. Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan.L.Rev. 545 (1975).

always "cut," had any bearing on this defense. Perry did not deny knowing what "cut" was. Even if he had done so I do not see how his possession of cut cocaine would have any bearing upon such a denial. One may know that certain illicit drugs are cut without having knowledge that mannite is a cutting substance. In any event, proof that Perry later possessed cut cocaine or knew what "cut" was does not make it more likely that he had knowledge about the true nature of the transaction which had occurred in the barber shop over four months earlier. Surely the probative value of this evidence was so marginal—to show, as Judge Gurfein puts it, that Perry was "streetwise"—and its prejudicial impact so great that the evidence must have been inadmissible under Fed.R.Evid. 404(b). *See* 22 Wright & Graham, *Federal Practice and Procedure: Evidence* § 5245 at 504–08 (1978). "The court has not only the discretion but also the duty to exclude evidence of little or no relevance or probative value which might have a prejudicial effect." *Security State Bank v. Baty*, 439 F.2d 910, 913 (10th Cir. 1971). I therefore dissent.