**UNITED STATES of America, Appellee,**

**v.**

**Michael MOHEL, Defendant-Appellant.**

**No. 1065, Docket 79–1019.**

United States Court of Appeals, Second Circuit.

Argued May 25, 1979.

Decided July 31, 1979.

---

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Michael Ross, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., David C. Patterson, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MANSFIELD, GURFEIN, Circuit Judges, and MISHLER, Chief Judge.*

MANSFIELD, Circuit Judge:

Michael Mohel appeals from a judgment of the United States District Court for the Southern District of New York entered on January 11, 1979, after a jury trial before Pierre N. Leval, *Judge*, convicting Mohel of distributing and possessing with intent to distribute cocaine on April 15, 1978, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). The conviction resulted from Mohel's second trial. The first trial, also before Judge Leval, ended in a mistrial when the jury was unable to reach a verdict. The only claim on appeal is the improper admission of evidence of a prior similar act. We reverse.

The evidence against the defendant at trial consisted mainly of the testimony of Nelson Griffith. Griffith testified that he had known Mohel for roughly two years, having been introduced to him by a person identified only as "Eric", and that he had on occasion purchased cocaine from Mohel in amounts of one-half ounce for $700. On April 15, 1978, Griffith drove to Mohel's apartment. He parked outside the building and called Mohel on a public telephone, and the defendant came downstairs to open the

door. The two men then went up to Mohel's apartment, where the defendant gave Griffith two sample "blows" of cocaine. Griffith found the sample to be good and purchased a quantity wrapped inside two plastic bags for $700 in cash.[1] Griffith left the apartment soon thereafter and was almost immediately arrested by agents of the FBI and DEA.

Griffith cooperated with the Government and made a taped telephone call to Mohel from DEA headquarters that day.[2] Several days later, unknown to the Government agents, Griffith called Mohel and arranged for them to meet at Griffith's house. Griffith told Mohel about the arrest. Over defense counsel's vigorous objection, Griffith testified that he also told Mohel that "Eric told me that he [Mohel] had got ripped off by two guys that were in jail and the guys that were testifying against him and the agents, they were looking for him, and you know, a lot of other things, that I don't quite remember at the moment. And Michael [Mohel] told me that most of it was not true, but if he didn't get ripped off he would have been something."[3] Griffith then asked Mohel for either money or cocaine to help pay for a lawyer, but appellant said that he had nothing to give Griffith.

Griffith met again with the Government agents and told them that he had talked with Mohel. Griffith then placed another recorded telephone call to Mohel from DEA

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. The powder weighed 13.91 grams, and 25 percent of the powder was cocaine.

2. The tape and a transcript of the recorded conversation were introduced at trial.

3. The trial court at this point gave a limiting instruction to the jury. The instruction provided in relevant part:

"You may consider the defendant's words only insofar as they bear on his knowledge at the time that he was speaking and at the time that this alleged offense took place concerning cocaine, and you may consider it insofar

as you may find it reflects his intention concerning the subject matter of this indictment, which is being tried before you.

"If you should find that those words indicate that the defendant committed some criminal activity at some time in the past, which is not the criminal activity charged in the indictment, you may not consider those past actions of the defendant as indicating any propensity on his part to commit crimes of that type, and you may not consider his having committed crimes in the past, if you find that he did, as in any way increasing the likelihood that he committed the crime charged in the indictment which is on trial before you."

headquarters.[4] The two agreed to meet in person later, but such a meeting never took place.

The testimony of Griffith was corroborated to some extent by that of the Government agents. Agent Swint of the FBI testified that he had seen Griffith and Mohel meet at Griffth's apartment twelve days before the transaction charged in the indictment. On April 15, 1978, Swint saw Griffith drive up to Mohel's apartment building, place a call from a public telephone, meet the defendant at the door of the building, and leave roughly thirty minutes later. Swint also testified concerning the arrest of Griffith soon after Griffith left the defendant's apartment building.

Swint stated that he arrested Mohel on May 2, 1978. At DEA headquarters, after reading the defendant his rights, Swint "told him—I didn't ask, I told him that I was aware that he had been ripped off for a large quantity of cocaine in the past." In response, Mohel told Swint, " 'I don't know how I can help you in that area. The two individuals that I was fronting for are no longer in the country.' " Swint stated that a short time later, at the end of the interview, Mohel said, as if he were talking to himself, " 'I could have been the biggest.' "[5]

### DISCUSSION

Appellant contends that the trial court committed reversible error in admitting into evidence the testimony concerning his two "ripped off" statements. We agree.

■ The applicable legal doctrines are well settled. "Other-crime" evidence[6] is not admissible to show that a defendant has a bad character or propensity to commit the crime at issue, although it may be admissible for other relevant purposes. Fed.R. Evid. 404(b). See *United States v. DeVaughn*, 601 F.2d 42, 45 (2d Cir. 1979);

*United States v. Williams*, 596 F.2d 44, 50 (2d Cir. 1979); *United States v. Lyles*, 593 F.2d 182, 193 (2d Cir. 1979); *United States v. Manafzadeh*, 592 F.2d 81, 86 (2d Cir. 1979); *United States v. Papadakis*, 510 F.2d 287, 294 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). The evidence must be relevant to an actual issue in the case, and its probative value on that issue must not be outweighed by its unfair prejudice to the defendant. *United States v. DeVaughn, supra*, 601 F.2d at 45; *United States v. Williams, supra*, 596 F.2d at 50; *United States v. Lyles, supra*, 593 F.2d at 193; *United States v. Manafzadeh, supra*, 592 F.2d at 86, and cases collected there. See also Fed.R.Evid. 403.

■ There is no presumption that other-crime evidence is relevant. *United States v. DeVaughn, supra*, 601 F.2d at 45; *United States v. Manafzadeh, supra*, 592 F.2d at 86. "[C]aution and judgment are called for, and a trial judge faced with an other crimes evidence problem should require the Government to explain why the evidence is relevant and necessary." *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978), *quoted in United States v. Manafzadeh, supra*, 592 F.2d at 86; *United States v. DeVaughn, supra*, 601 F.2d at 46. Otherwise, "the accused might be convicted because of his participation in the other crimes rather than because he is guilty beyond a reasonable doubt of the crime alleged." *United States v. Manafzadeh, supra*, 592 F.2d at 86. See also *United States v. Papadakis, supra*, 510 F.2d at 294.

■ In the present case, the Government argues that the other-crime evidence was admissible to show Mohel's intent and knowledge. The Government contends as well that the evidence was admissible under a corroboration theory. Judge Leval admitted the testimony concerning Mohel's two "ripped off" statements only on the issues

---

4. This tape and a transcript of the recorded conversation were also introduced at trial.

5. Judge Leval again gave a limiting instruction to the jury similar to that given after Griffith's testimony. See note 3, *supra*.

6. There is no doubt that the two statements by Mohel concerning cocaine dealings two years earlier constitute other-crime evidence. The fact that the evidence is in the form of statements by the defendant himself does not change the applicable analysis.

of intent and knowledge;[7] in his charge to the jury, however, Judge Leval also instructed the jury that "[t]he government contends that if you believe Agent Swint's testimony concerning the defendant's statement, and if you find that it was similar to the statement concerning which Griffith testified, you may take Swint's testimony as corroboration of Griffith's testimony on that point."[8]

There is no doubt from the record that defense counsel sought to remove the issues of intent and knowledge from the case. The theory of the defense was that Griffith, the only witness to the alleged sale, was a liar who was trying to set up Mohel in order to avoid punishment himself. The cross-examination of Griffith was lengthy and vigorous.[9] In short, the defense was not that Mohel thought he was selling some other, legal substance; the defense was that the alleged sale was a total fabrication on the part of Griffith. Cf. *United States v. Manafzadeh, supra*, 592 F.2d at 87; *United States v. O'Connor, supra*, 580 F.2d at 41; *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978).

Defense counsel repeatedly offered to stipulate to the necessary knowledge and intent if the jury found that Mohel had in fact sold the cocaine to Griffith. At a pretrial conference, the defendant took the position that "the issue of wilfulness and whether the defendant did what he did knowingly is really too confusing and irrelevant," and he wanted the court to delete intent and knowledge from the charge to the jury even "if it takes a stipulation or a concession on our part that if the jury believes beyond a reasonable doubt that the transaction alleged did take place, and that Exhibit 1 was the merchandise transferred

during the transaction, then they couldn't go into this business of whether it was knowingly or whether it was wilful, to simplify it." Again on the first day of trial, before the jury was empaneled, defense counsel informed the court that "I have now stated in the first trial and I have repeated it since, that the defendant was not going to put knowledge and intent in issue here, basically concede that if the transaction of April 15th took place, then it could be inferred from that transaction that he knew what he was doing." Again, prior to opening statements, defense counsel made his position clear. "I would say at trial I will make it absolutely clear that I am not placing intent and knowledge in issue at all, whether each transaction took place, so those [two other-crime] statements won't even be admissible on the issue of knowledge and intent, which is the only basis on which your Honor admitted them at the first trial."

The opening statement by defense counsel was clear in its focus. The jury was informed that "[w]hat is to come in part, I promise you, is a case in which everything rests on one witness, one witness. You will hear more than one witness, but essentially you will come to the point where if you have but a reasonable doubt concerning whether it is so that on April 15th of this year this defendant Michael Mohel sold a certain Exhibit 1 to Nelson Griffith, then it will be your duty to acquit Michael Mohel, regardless of what any of the other witnesses might say." Defense counsel then stressed the central theme of his case: "I propose to demonstrate to you that the man [Nelson Griffith] is an out and out perjurer . . . ."[10]

---

7. See notes 3 and 5, *supra*.

8. Judge Leval had reserved decision on whether the two statements could be used under a corroboration theory until just prior to the summations.

9. The cross-examination elicited several statements damaging to Griffith's credibility. For example, Griffith attempted to explain several inconsistencies between his testimony at trial

and prior statements which he had also made under oath on the ground that he had simply answered the questions on prior occasions on the spur of the moment without thinking back to make sure the statements were correct.

10. Defense counsel conceded in the opening statement that one of the voices on the two tape-recorded telephone calls was that of Mohel.

Defense counsel again informed the trial court, after the opening statements, "I have categorically said that I was not putting my client's knowledge and intent in issue here so the statements shouldn't go in in any event." Similar remarks were made on the record even after the Griffith testimony concerning Mohel's "ripped off" statement was admitted at trial. For example, defense counsel outlined his planned summation to the trial court. "I intend to actually say that the issue is basically—one of the principal issues is whether the transaction took place and whether Exhibit 1 is proved beyond a reasonable doubt to have come from my client; and that if it should be found that it did come from my client under circumstances pretty much as described by Griffith, then obviously he had the intent and the knowledge; that follows naturally from the relationship."

Finally, in his summation to the jury, defense counsel stated "We are not here contesting, Mike Mohel is not, the defense is not, that, yes, maybe we transmitted this bag on the 15th but we thought it was sugar or it was flour, we didn't intend it to be cocaine. It is the assertion here that this defendant did not transmit the contents of Exhibit 1 on the fateful evening at all. It is not. So it is not a matter of mistake."

Thus the position of the defendant was quite consistent from the pretrial conference all the way through the summation— intent and knowledge were not at issue, those elements of the offense were conceded if the jury found beyond a reasonable doubt that Mohel distributed cocaine to Griffith.

Such an unequivocal offer of stipulation or concession serves to remove intent and knowledge as issues in the case. See *United States v. DeVaughn, supra,* 601 F.2d at 46; *United States v. Manafzadeh, supra,* 592 F.2d at 86–87. Cf. *United States v. O'Connor, supra,* 580 F.2d at 41; *United States v. Benedetto, supra,* 571 F.2d at 1249; *United States v. Williams,* 577 F.2d 188, 191 (2d Cir.), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978) ("[O]ther crimes evidence is inadmissible to prove intent when that issue is not really in dispute"). Therefore, the other-crime evidence was not admissible on the issues of intent and knowledge.

The Government contends that the defendant preserved the issues of intent and knowledge through his cross-examination of the Government's chemist, which, among other things, probed at the chain of custody for the cocaine and also at whether the white powder in the two plastic bags was visible. However, this line of questioning did not raise an issue as to the defendant's knowledge and intent. The visibility of the powder was something testified to by Griffith and contradicted by one of the FBI agents; the cross-examination of the chemist in that respect was designed to demonstrate the lack of credibility of Griffith.[11] As for the chain of custody issue, no argument was ever made or suggested to the jury that Mohel had given Griffith some white powder other than cocaine; indeed, such a suggestion was expressly eschewed by defense counsel during summation. The inquiry was designed to show that Griffith had been fabricating his entire story, including his own possession of cocaine. Judge Leval noted that the "cross-examination could only have been to suggest to the jury that there is a possibility that they should not even be sure that there was cocaine on Griffith. . . ." The trial court specifically stated that "I know that the chemist's testimony was not related to those particular aspects [intent and knowledge] of the charge." Thus there is no support in the record for the Government's contention that appellant failed to act in accordance with his frequently announced strategy to concede intent and knowledge.

The Government also argues that there must be a written stipulation before the elements of intent and knowledge can be treated as not in issue. Such an asser-

---

11. The chemist in fact was unable to recall whether the powder was visible through the two bags.

tion contravenes our prior decisions. It is enough that defendant has unequivocally *offered* the concession and then acts accordingly. See e. g., *United States v. DeVaughn, supra,* 601 F.2d at 46; *United States v. Manafzadeh, supra,* 592 F.2d at 87. In the instant case, as in *Manafzadeh* and *DeVaughn,* defense counsel flatly offered to concede that if the jury found the transaction took place then it could conclude Mohel had the necessary intent. The Government chose not to agree. Indeed, the Government below, in response to appellant's offer to stipulate intent and knowledge, pressed vigorously for another theory, corroboration, under which to admit the same other-crime evidence, thus attempting to undermine defense counsel's offer. Given the dangerous prejudicial value of other-crime evidence, we cannot agree that the Government, by evading an unequivocal offer to stipulate, may create an issue as to intent and knowledge for the purpose of admitting the objected-to evidence.

■ The Government's fear that it might be "whipsawed" by such a concession into not presenting evidence with respect to an element of the offense, only to have a conviction reversed or an acquittal returned due to lack of proof of the element conceded, is unfounded. The record must reflect, as it does here, an unequivocal concession of the element by the defendant. Once that offer is made, the other-crime evidence should be excluded. The trial judge may then instruct the jury that such a concession has been made and that if the jury finds beyond a reasonable doubt that all the other elements of the offense have been established a verdict of guilty may be returned.[12]

[9, 10] Thus appellant did all that is required affirmatively to remove intent and knowledge as issues at trial, and it was error to admit the other-crime evidence on that rationale. The Government urges here, however, as it did below, that there is a separate theory under which the two "ripped off" statements are admissible—that the testimony of Griffith and Agent Swint corroborate each other in that respect and therefore corroborate the crucial testimony of Griffith concerning the events of April 15, 1978. However, other-crime evidence is only admissible for the purpose of corroboration if "the corroboration is direct and the matter corroborated is significant." *United States v. Williams, supra,* 577 F.2d at 192. See also *United States v. O'Connor, supra,* 580 F.2d at 43; *United States v. Manafzadeh, supra,* 592 F.2d at 88; *United States v. DeVaughn, supra,* 601 F.2d at 46. The alleged corroboration in this case was neither direct nor significant. First, neither of the two "ripped off" statements would be admissible by itself; unlike *United States v. Williams, supra,* 577 F.2d at 191–92, where the other-crimes evidence directly corroborated properly admitted inculpatory testimony of a co-conspirator concerning defendant's remarks made during the course of the conspiracy regarding the feasibility of the bank robbery being planned by the conspirators and his expertise on the subject, the two statements incorporating other-crime evidence here rely solely on each other for corroboration. In short, one inadmissible statement regarding another crime is not rendered admissible merely because it corroborates another equally inadmissible statement on the same subject. Such a "bootstrap" theory cannot be permitted.[13]

12. We are unwilling to assume bad faith on the part of a defense counsel in terms of offering to concede an element of the offense in order to prevent admission of other-crime evidence and then not acting accordingly. If such misconduct, as feared by the Government, should occur, the trial court could devise appropriate remedies, such as striking contrary evidence or remarks proffered by defense counsel. Contrary to the assertion of the Government, the offered concession does not constitute "coun-

sel's non-binding protestations that [an issue] is not 'really' contested"; once the concession is offered and the trial court excludes the other-crime evidence as not relevant to an actual issue in the case, the defendant has waived the right to contest the issue.

13. Judge Leval had already admitted the other-crime evidence as relevant solely to the issues of knowledge and intent prior to ruling on the Government's corroboration theory, and therefore he did not rule on the corroboration theory

Second, the "direct" corroboration here solely concerns Mohel's prior criminal activity, which of course is not legitimately relevant to the case. The two statements made by Mohel as testified to by Griffith and Swint both occurred after April 15 and and did not concern the alleged crime at all.[14] The Government argues that the testimony of Swint and Griffith on the "ripped off" statements tends to corroborate Griffith's testimony that he had a drug related conversation with Mohel after Griffith's arrest, which in turn according to the Government tends to corroborate Griffith's testimony that he bought cocaine from Mohel on April 15. Such a piling of indirect inference upon indirect inference is improper.

Even assuming that corroborative testimony regarding Mohel's statements as to his other crimes was not clearly inadmissible, proof that Griffith might have told the truth on the witness stand with respect to a matter wholly unrelated to the crime at issue in this case is hardly "significant" within the meaning of *United States v. Williams, supra,* 577 F.2d at 192. Admission of the evidence, on the other hand, was highly prejudicial to Mohel. The testimony invited the jury to conclude that Mohel had been a cocaine dealer in the past, had wanted to become "big" in the illegal sale of cocaine, and therefore "had a bad character or propensity to commit the crime in issue," *United States v. Manafzadeh, supra,* 592 F.2d at 86. At best, therefore, the evidence directly supported the one inference which is specifically forbidden by Rule 404(b).

Since the admission of the testimony of Griffith and Swint concerning the "ripped off" statements by Mohel was prejudicial error, we reverse the conviction and remand the case for a new trial.

---

in the form in which it is now advanced. It is questionable whether the trial court would have admitted the evidence based solely on this corroboration theory.

At oral argument the Government alluded for the first time to the "signature" theory as a ground for admission of the other crime evidence. Such a suggestion is frivolous. Griffith's paraphrasing of Mohel's statement—"Michael told me that most of it was not true, but if he didn't get ripped off he would have been something"—and Swint's more colorful testimony—"he was talking to himself, it seemed to me, and he said to me, 'I could have been the biggest'"—hardly rise to the level of a "unique scheme or pattern," *United States v. Manafzadeh, supra,* 592 F.2d at 88–89. Even assuming the two statements were sufficiently similar and unique as to constitute a "signature," that would only be relevant to the identity of the person who made both statements, which was not an issue at trial; it would have no relevance at all to the actual issue at trial, which was whether Mohel sold cocaine to Griffith on April 15.

14. The Government argued at trial that the two statements constituted admissions of the crime charged by the defendant. Judge Leval properly rejected this contention, stating that "they do not constitute admissions of the commission of the crime that the defendant is charged with. They do not constitute admissions of a sale to Griffith. They seem to be on different subjects. It was a different subject that was raised."